The State of Ohio, Appellee, *v.* Ketterer, Appellant.

[Cite as *State v. Ketterer,* 111 Ohio St.3d 70, 2006-Ohio-5283.]

(No. 2004–0485—Submitted February 7, 2006—Decided October 25, 2006.)

Moyer, C.J.

{¶ 1} In the late afternoon on February 24, 2003, defendant-appellant, 53–year–old Donald Ketterer, beat and stabbed 85–year–old Lawrence Sanders to death in Hamilton, Ohio. Ketterer then stole money and other property and drove Sanders's car away. Ketterer pleaded guilty to burglary, aggravated burglary, aggravated robbery, grand theft of a motor vehicle, and aggravated murder and was sentenced to death.

{¶ 2} According to his confession, Ketterer went to Sanders's home on Shuler Avenue in Hamilton, Ohio on February 24, 2003, to borrow $200 so he could pay a court fine. Ketterer claimed that Sanders "swore up and down to [him] that he did not have the money" and asked Ketterer to leave. Ketterer felt that Sanders "was being very disrespectful," and he hit Sanders in the head with a skillet three times. Ketterer remembered thinking, "[I]f I just knocked him out, he would know who did it, so I thought I should stab him," which Ketterer did. Ketterer further stated that after Sanders "quit moving," Ketterer took $60 to $70 out of Sanders's wallet, searched the house for more money, and found loose and rolled coins. Then he drove away in Sanders's 1995 Pontiac Grand Am.

{¶ 3} Mary Gabbard, a friend of Ketterer's, said that Ketterer was at her East Avenue residence on the evening of February 24, wearing yellow gloves that appeared to have blood on them. When Gabbard asked about the blood, Ketterer said that he had been in a fight. According to Gabbard, latex gloves that police found at her residence were similar to those that Ketterer had worn on February 24. A forensic scientist concluded that DNA extracted from blood on these gloves contained a mixture of DNA that belonged to Sanders and Ketterer.

{¶ 4} Gabbard also reported that around 11:30 p.m. on February 24, Ketterer again stopped by her residence. Both Gabbard and Ketterer used drugs, often together, and Gabbard had supplied drugs to Ketterer. At that time, Ketterer told Gabbard that "he had some stuff that he had stolen," including "crosses, rosaries, costume jewelry" and "a couple hundred dollars worth of change." Ketterer wanted "to trade [these items] for crack cocaine." Ketterer also

explained that "he wanted to go back over there [to Shuler Avenue] because he had [by mistake] * * * gotten the woman's stuff and he wanted the man's stuff." The evening before, Gabbard had left her home and had bought cocaine for Ketterer, using $40 that he had given her. When Gabbard woke up around 5:30 a.m. on February 25, Ketterer left her residence. In his confession, Ketterer admitted that at around 4:00 p.m. on February 25, he had returned to Sanders's house for an hour and a half and had stolen silverware and other items.

{¶ 5} Around 7:00 p.m. on February 25, Hamilton police officer Christy Collins impounded Sanders's abandoned 1995 Pontiac Grand Am, which had struck a garage near East Avenue, where Gabbard lived. After Officer Collins traced the car, she went to Sanders's home, but got no response. At about that same time, Lisa Lawson, a bartender, saw Ketterer at Cindy's Pub. When Ketterer got up to leave, he dropped a bag, and "stuff [was] laying all over the floor," including coins. Lawson helped Ketterer put the items into another bag, and Ketterer told her, "I've got to get out of here. I have heat on me." A cab driver then drove Ketterer over to East Avenue.

{¶ 6} Shortly after 7:00 p.m. that same evening, police officers seeking to interview Ketterer about an unrelated matter found him outside Gabbard's home and asked him to voluntarily come to the station. Ketterer was carrying a plastic bag, which he brought to the station. Around 8:30 p.m., police advised Ketterer of his *Miranda* rights, which he waived. Ketterer consented in writing to a search of his person and the plastic bag he carried. Police found a large quantity of loose change and rolled coins in Ketterer's possession, as well as papers that mentioned Sanders.

{¶ 7} That evening, police went to Sanders's home and discovered his mutilated body inside. The contents of drawers had been dumped on the floor, and Sanders's pants pockets were inside out. The back of Sanders's wristwatch case was loose, and his watch had stopped at 5:18 or 5:20. A broken skillet was found in the kitchen. In the alley behind Sanders's house, police found silverware that Ketterer had dropped.

{¶ 8} Dr. James Swinehart, a pathologist, concluded after an autopsy that Sanders had died of "multiple traumatic injuries," including "a severe craniocerebral injury with extensive skull fractures," nine distinct "stab wounds with penetration * * * of the left lung," and "multiple bilateral rib fractures." In addition, "two forks, a knife, and a pair of scissors" had been stuck in Sanders's face. Dr. Swinehart also discovered multiple defensive wounds on Sanders's hands and arms.

{¶ 9} Around 12:30 a.m., on February 26, after Sanders's body had been found, police returned to the police station. Police again advised Ketterer of his *Miranda* rights, which he waived. Ketterer initially denied recollection of

Sanders's death. But during a later interview that morning, Ketterer orally confessed and then signed a written confession. At 5:05 a.m., Ketterer signed another statement admitting that he killed Sanders.

## Charges and Verdict

{¶ 10} The grand jury indicted Ketterer in Count One for the aggravated murder of Sanders in the course of an aggravated robbery. Count One included three death specifications: specification one, R.C. 2929.04(A)(3) (murder to escape detection or apprehension), specification two, R.C. 2929.04(A)(7) (murder during an aggravated robbery), and specification three, R.C. 2929.04(A)(7) (murder during an aggravated burglary). The grand jury also indicted Ketterer for aggravated robbery in Count Two, aggravated burglary in Count Three, grand theft of a motor vehicle in Count Four, and burglary in Count Five. Count Five reflected Ketterer's return to the crime scene on February 25, the day after the murder. Ketterer waived a jury and pleaded guilty, as charged, before a three-judge panel. Following the state's presentation of evidence, the panel found Ketterer guilty as charged.

{¶ 11} After a penalty-phase hearing, the three-judge panel sentenced Ketterer to death for the aggravated murder of Sanders and to prison terms, as well as fines, for the other felonies.

{¶ 12} The case is now on direct appeal to our court, and Ketterer presents 15 propositions of law for our consideration. We find no merit in any of his propositions. Hence, we affirm the findings of guilt. We have independently weighed the aggravating circumstances against the mitigating factors and have considered the appropriateness of the death sentence. For the reasons that follow, we affirm the judgment of the trial court, including the death sentence.

## Jury Waiver and Guilty Plea (II)

{¶ 13} In proposition II, Ketterer argues that he did not "knowingly, intelligently, and voluntarily" waive a jury trial and enter a guilty plea. Ketterer further argues that the trial court did not adequately inform him of his rights, particularly in view of his mental illness and medication.

{¶ 14} Contrary to Ketterer's claims, the record establishes that Ketterer consulted with his lawyers and was competent to be tried, plead guilty, make decisions about his case, and communicate with his attorneys. Further, the record is clear that Ketterer understood what he was doing by waiving a jury trial and pleading guilty as charged to the indictment. The following transcript of the proceedings at the trial court supports these conclusions:

{¶ 15} "JUDGE ONEY: Mr Ketterer, I have in front of me where you have signed a jury waiver.

{¶ 16} "THE DEFENDANT: Yes, ma'am.

{¶ 17} "JUDGE ONEY: And have you consulted with your attorneys on this procedure?

{¶ 18} "THE DEFENDANT: Yes, ma'am, I have.

{¶ 19} "JUDGE ONEY: And you talked with them several times leading up to also talking with them last night and talking with them this morning; is that correct?

{¶ 20} "THE DEFENDANT: That's correct.

{¶ 21} "JUDGE ONEY: And * * * did you receive advice from your attorneys in regard to the procedure?

{¶ 22} "THE DEFENDANT: Yes, ma'am.

{¶ 23} "JUDGE ONEY: And you understand that—what the function of the jury would be that you have a potential to go to a jury, and they would be making a decision as to guilt or innocence on the charges. Do you understand that?

{¶ 24} "THE DEFENDANT: Yes, ma'am.

{¶ 25} "JUDGE ONEY: And then if they found [you] guilty on the Count One, the aggravated murder, then they would also be making a decision as to the proper sentence to impose. Do you understand that?

{¶ 26} "THE DEFENDANT: Yes, ma'am."

{¶ 27} " * * *

{¶ 28} "JUDGE ONEY: And with these discussions with your attorneys, are you satisfied with their advice?

{¶ 29} "THE DEFENDANT: Yes, ma'am.

{¶ 30} "JUDGE ONEY: And are you satisfied with their preparation on their case on your behalf?

{¶ 31} "THE DEFENDANT: Yes, ma'am, I am.

{¶ 32} "JUDGE ONEY: When you discussed with the attorneys, the pros and cons—did you discuss the pros and cons of going to a jury or going to a three-judge panel?

{¶ 33} "THE DEFENDANT: Yes, we did.

{¶ 34} "JUDGE ONEY: And did you discuss * * * with your attorneys that if you waived the jury, that there is a three-judge panel, and the matter could be even tried to the three-judge panel. Do you understand that?

{¶ 35} "THE DEFENDANT: Yes, ma'am.

{¶ 36} "JUDGE ONEY: Or a guilty plea could be entered?

{¶ 37} "THE DEFENDANT: Yes, ma'am.

74

{¶ 38} "JUDGE ONEY: And if a guilty plea was entered or if and there was a trial and the three-judge panel found that you were guilty of aggravated murder, there would be a second trial phase on the aggravating factors and mitigating circumstances, do you understand that?

{¶ 39} "THE DEFENDANT: Yes, ma'am.

{¶ 40} "JUDGE ONEY: And it is your intention then to * * * continue with your jury waiver and go with a three judge panel?

{¶ 41} "THE DEFENDANT: Yes, it is."

{¶ 42} " * * *

{¶ 43} "JUDGE ONEY: Mr. Ketterer, can you read and write?

{¶ 44} "THE DEFENDANT: Yes, ma'am.

{¶ 45} "JUDGE ONEY: I have here a jury waiver, did you read this?

{¶ 46} "THE DEFENDANT: I just signed it about ten minutes ago.

{¶ 47} "JUDGE ONEY: Did you read it beforehand though?

{¶ 48} "THE DEFENDANT: Yes, ma'am.

{¶ 49} "JUDGE ONEY: And did you discuss this with your attorney?

{¶ 50} "THE DEFENDANT: Yes, ma'am.

{¶ 51} "JUDGE ONEY: And did you understand that you are waiving the right to have this matter go to trial by the jury that is upstairs?

{¶ 52} "THE DEFENDANT: Yes, ma'am.

{¶ 53} "JUDGE ONEY: Are you entering—doing this waiver voluntarily? Have any threats been made to you to get you to do this?

{¶ 54} "THE DEFENDANT: No.

{¶ 55} "JUDGE ONEY: Have any promises been made to you to get you to do this?

{¶ 56} "THE DEFENDANT: No, ma'am.

{¶ 57} "JUDGE ONEY: Do you have any problems with the English language? Do you understand this?

{¶ 58} "THE DEFENDANT: I understand it perfectly.

{¶ 59} "JUDGE ONEY: Are you * * * knowingly and intelligently and voluntarily waving your right to a jury trial?

{¶ 60} "THE DEFENDANT: Yes, ma'am, I am."

{¶ 61} Further, Ketterer personally acknowledged that he understood that the three-judge panel would decide the sentence if he waived a jury trial.

{¶ 62} "JUDGE ONEY: You understand that if [this case] goes to a three-judge panel, not only will they be determining guilt, but they will also be determining the sentence that would be involved?

{¶ 63} "THE DEFENDANT: Yes, ma'am, I do."

{¶ 64} Later that afternoon, before accepting his guilty plea, the court conducted a further inquiry of Ketterer to ensure that he understood his jury-trial waiver, how the case would proceed before a three-judge panel, and the ramifications of a guilty plea.

{¶ 65} *Jury waiver.* Ketterer's complaint about the extent of the court's inquiry into his jury-trial waiver lacks merit. In *State v. Jells* (1990), 53 Ohio St.3d 22, 559 N.E.2d 464, paragraph one of the syllabus, we held: "There is no requirement for a trial court to interrogate a defendant in order to determine whether he or she is fully apprised of the right to a jury trial." Further, "[t]he Criminal Rules and the Revised Code are satisfied by a written waiver, signed by the defendant, filed with the court, and made in open court, after arraignment and opportunity to consult with counsel." Id. at 26, 559 N.E.2d 464. Accord *State v. Foust,* 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 53; *State v. Baston* (1999), 85 Ohio St.3d 418, 421, 709 N.E.2d 128; *State v. Spivey* (1998), 81 Ohio St.3d 405, 408–409, 692 N.E.2d 151.

{¶ 66} Moreover, in *State v. Turner,* 105 Ohio St.3d 331, 2005-Ohio-1938, 826 N.E.2d 266, ¶ 25, we held, "[A] written jury waiver is presumed to have been voluntary, knowing, and intelligent," citing *United States v. Sammons* (C.A.6, 1990), 918 F.2d 592, 597. Accord *State v. Fitzpatrick,* 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 41.

{¶ 67} In this case, Ketterer has presented no basis to rebut that presumption. The inquiry previously quoted reflects that Ketterer's decision to waive a jury was a knowing, intelligent, and voluntary decision. In addition, Dr. Bobbie Hopes, a clinical psychologist, concluded on January 16, 2004, 11 days before the jury waiver, that Ketterer was competent to stand trial and make decisions about his case. On January 20, the trial court found Ketterer competent to stand trial.

{¶ 68} Contrary to Ketterer's claim, the trial court was not required to specifically advise Ketterer on the need for juror unanimity. We rejected similar claims in *State v. Bays* (1999), 87 Ohio St.3d 15, 19–21, 716 N.E.2d 1126, citing *United States v. Martin* (C.A.6, 1983), 704 F.2d 267. In *Bays,* we noted that "a defendant need not have a complete or technical understanding of the jury trial right in order to knowingly and intelligently waive it." Id. at 20, 716 N.E.2d 1126. Nor is the trial court "required to inform the defendant of all the possible implications of waiver." Id. Accord *Sowell v. Bradshaw* (C.A.6, 2004), 372 F.3d 821, 833–836; *State v. Turner,* 105 Ohio St.3d 331, 2005-Ohio-1938, 826 N.E.2d 266, ¶ 24–25; *Fitzpatrick,* 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927,

¶ 44–46 (accused need not be told that jury unanimity is necessary to convict and to impose sentence).

{¶ 69} Thus, the trial court need not explain a wide variety of legal concepts, such as reasonable doubt, to secure a valid jury waiver. As the United States Supreme Court has noted, "the law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply *in general* in the circumstances—even though the defendant may not know the *specific detailed* consequences of invoking it." (Emphasis sic.) *United States v. Ruiz* (2002), 536 U.S. 622, 629, 122 S.Ct. 2450, 153 L.Ed.2d 586.

{¶ 70} Moreover, "[s]ince *Jells* holds that no inquiry is required, the trial court's failure to make specific inquiries of the defendant cannot be error." *State v. Filiaggi* (1999), 86 Ohio St.3d 230, 238, 714 N.E.2d 867; *Baston*, 85 Ohio St.3d at 422, 709 N.E.2d 128 (colloquy on the standard of review on appeal not needed). Further, the court's reference to a jury's deciding "guilt or innocence" was not misleading, but reflected simply a shorthand explanation.

{¶ 71} Ketterer also challenges his jury waiver on the grounds that the trial court did not adequately inquire into medication that he was taking. However, we hold that the trial court did conduct an adequate inquiry into Ketterer's medication and determined that it did not affect Ketterer's understanding of the proceedings or his decision-making ability. The fact that a defendant is taking antidepressant medication or prescribed psychotropic drugs does not negate his competence to stand trial. See *Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 36–39; *State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, ¶ 38.

{¶ 72} Further, Dr. Hopes had found Ketterer competent in this case and noted at the time of the evaluation that Ketterer "was receiving psychotropic medication, which may have been controlling many symptoms of mental illness, but he continued to exhibit residual symptoms." The trial court had found Ketterer competent, and the court could rely upon its own observations because Ketterer had appeared before the court on several occasions. Also, Ketterer's counsel never challenged their client's ability to understand the jury-waiver or guilty-plea process.

{¶ 73} The fact is that "*nobody* on the spot thought [defendant's] behavior raised any question as to his competence." (Emphasis sic.) *State v. Cowans* (1999), 87 Ohio St.3d 68, 84, 717 N.E.2d 298. Cf. *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, ¶ 39; *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 27–34. "[F]actual determinations are best left to those who see and hear what goes on in the courtroom." *Cowans*, 87 Ohio St.3d at 84, 717 N.E.2d 298.

{¶ 74} Ketterer voluntarily signed his waiver, and his signed waiver is in the case file. "Pursuant to *Jells,* no more was required." *Filiaggi,* 86 Ohio St.3d at 238, 714 N.E.2d 867. Accord *Fitzpatrick,* 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 43; *State v. Thomas,* 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, ¶ 26.

{¶ 75} *Guilty plea.* In challenging the voluntariness of his guilty plea, Ketterer again challenges the sufficiency of the trial court's inquiry into the medication he was taking. Again, we find no error. Ketterer also asserts deficiencies in his understanding of the legal process based on the pretrial competency report. But that report was issued 11 days before Ketterer pleaded guilty. Thus, that report was issued before counsel had lengthy discussions with Ketterer and before the trial court's inquiry on his jury waiver and guilty plea.

{¶ 76} Here, the trial court fully complied with the requirements to accept a guilty plea. See *State v. Turner,* 105 Ohio St.3d 331, 2005-Ohio-1938, 826 N.E.2d 266, ¶ 33–34; *State v. Ballard* (1981), 66 Ohio St.2d 473, 20 O.O.3d 397, 423 N.E.2d 115, paragraph one of the syllabus; Crim.R. 11(C)(2)(c). We hold that the inquiry was adequate. Cf. *Fitzpatrick,* 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 57 (aside from specific duties of the court delineated in Crim.R. 11(C), if counsel has informed a defendant of the statutory and constitutional rights that a guilty plea would forgo, the court need not); *State v. Mink,* 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, ¶ 62–85.

{¶ 77} In this case, the trial court conducted a thorough inquiry in open court to ensure that Ketterer's guilty plea was made knowingly, intelligently, and voluntarily. The court informed Ketterer at length of the possible sentences that could be imposed on the aggravated murder charge as well as the other charges, that a separate hearing would be held to determine the penalty on the aggravated murder charge, and that the three-judge panel would determine, after hearing evidence, what penalty to impose.

{¶ 78} Ketterer agreed that no threats or promises had been made to induce his plea. Further, Ketterer acknowledged that he understood that he was waiving his right to require the state to prove his guilt beyond a reasonable doubt, his right to confront witnesses, his right to subpoena witnesses, and his right to remain silent or to testify, as he chose. He further asked that the court accept his guilty plea to all charges and specifications.

{¶ 79} Ketterer acknowledged that he had discussed his jury waiver and guilty pleas with his attorneys and was satisfied with their advice and "with the efforts that they have made in representing" him. Further, when asked whether he had any questions about the plea or needed to talk with his lawyers more, Ketterer responded, "No, we talked it over last night for quite a bit and talked it over today quite a bit. And I wish to go on with it." Ketterer also signed written

guilty pleas that fully acknowledged his rights. For the foregoing reasons, we reject proposition II.

### *Ineffective Assistance of Counsel—Guilty Plea (I)*

{¶ 80} In proposition I, Ketterer contends that when defense counsel advise their client to plead guilty to a capital offense without first securing an agreement that a life sentence be imposed, they are per se ineffective.

{¶ 81} Reversal of a conviction for ineffective assistance requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. The United States Supreme Court has recognized that the "two-part *Strickland v. Washington* test applies to challenges to guilty pleas based on ineffective assistance of counsel." *Hill v. Lockhart* (1985), 474 U.S. 52, 58, 106 S.Ct. 366, 88 L.Ed.2d 203. Accord *State v. Bird* (1998), 81 Ohio St.3d 582, 585, 692 N.E.2d 1013.

{¶ 82} Ketterer claims that counsel were ineffective because they advised him to plead guilty without attempting to negotiate a life sentence. But the record does not reflect whether Ketterer, through counsel, attempted to exchange a guilty plea for a life sentence. Further, nothing in the record supports Ketterer's claim that his counsel instructed Ketterer to plead guilty.

{¶ 83} In addition, the record contradicts Ketterer's claim that counsel "did not talk with their client" about proceeding with a guilty plea after the court ruled that a guilty plea before a panel precluded jury sentencing. In addition to the dialogue quoted earlier, the record contains the following additional dialogue:

{¶ 84} "[Defense counsel] MR. HOWARD: It's our intention, Judge, to present or enter our guilty plea to a three-judge panel, and we have discussed that with Mr. Ketterer. We discussed that with him yesterday afternoon and quite lengthy discussion at the jail, and we discussed it with him here again this morning. * * * [I]f he does waive the right to have a jury hear the trial phase, then he also waives that right to have the jury * * * hear the sentencing phase, and he is aware then that if he pleads to a three judge panel that the mitigation evidence will also be presented to the three judge panel * * *."

{¶ 85} Second, even assuming that Ketterer's counsel had advised their client to plead guilty, a fact not established, that advice does not reflect ineffective assistance of counsel per se. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *Bird,* 81 Ohio St.3d at 585, 692 N.E.2d 1013 (judicial scrutiny of counsel's tactical

decisions, including recommending to the client a no-contest plea, must be highly deferential).

{¶ 86} Counsel may have reasonably believed that a guilty plea could minimize the effect of gruesome facts and a brutal murder, especially before a three-judge panel. By pleading guilty before a three-judge panel, counsel obtained the benefit of substantial mitigation evidence, namely remorse and a plea of guilty. See, e.g., *State v. Ashworth* (1999), 85 Ohio St.3d 56, 72, 706 N.E.2d 1231 ("guilty pleas are traditionally accorded substantial weight in imposing a sentence"). Further, there was overwhelming evidence of Ketterer's guilt. Forensic evidence linked Ketterer to the crime, and he confessed, was found in possession of the victim's personal property, and admitted the crime to Gabbard.

{¶ 87} Counsel's advice therefore reflects reasonable representation under *Strickland*. In *Shaw v. Martin* (C.A.4, 1984), 733 F.2d 304, 316, the Fourth Circuit Court of Appeals held that counsel's recommendation of a guilty plea in a capital case "was the product of their sound deliberation and judgment that [the defendant's] prospects were better with the sentencing judge than with a jury, especially considering the brutal and utterly sadistic facts of the case." See, also, *Reid v. True* (C.A.4, 2003), 349 F.3d 788 (counsel's deficient performance not shown in guilty plea to capital offense); *Carpenter v. State* (Okla.Crim.1996), 929 P.2d 988, 999 (counsel not ineffective when accused pleaded no contest in capital case).

{¶ 88} In *Wilson v. State* (1983), 99 Nev. 362, 372, 664 P.2d 328, the Nevada Supreme Court noted that counsel "encouraged [their clients] to plead guilty [to capital murder] so that they would be sentenced by a three judge panel rather than be exposed to a jury." The Nevada court held that such "advice and recommendation * * * are largely tactical decisions. We * * * will not second guess such matters when they relate to trial strategy."

{¶ 89} Third, the record does not demonstrate that Ketterer pleaded guilty based on any deficient advice from counsel. In ineffective-assistance claims in guilty-plea cases, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Lockhart*, 474 U.S. at 59, 106 S.Ct. 366, 88 L.Ed.2d 203. Cf. *Bird*, 81 Ohio St.3d at 585, 692 N.E.2d 1013 (no prejudice shown by guilty plea); *State v. Xie* (1992), 62 Ohio St.3d 521, 525, 584 N.E.2d 715 (defendant failed to prove he would not have pleaded guilty if attorney's advice had been correct); *State v. Brooks* (Iowa 1996), 555 N.W.2d 446, 448 ("where a factual basis exists for the plea, counsel usually will not be found ineffective for allowing the defendant to plead guilty").

{¶ 90} Moreover, as the Supreme Court recognized, "[i]n many guilty plea cases, the 'prejudice' inquiry will closely resemble the inquiry engaged in by

courts reviewing ineffective-assistance challenges to convictions obtained through a trial." *Lockhart,* 474 U.S. at 59, 106 S.Ct. 366, 88 L.Ed.2d 203. In view of the compelling evidence of Ketterer's guilt, any rational jury or panel of three judges would have convicted him whatever his plea. Thus, Ketterer has failed to establish "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. Accordingly, we reject proposition I.

### *Sufficiency of Evidence (III)*

{¶ 91} In proposition III, Ketterer argues that the evidence was insufficient to prove his guilt as to the R.C. 2929.04(A)(3) (murder to escape detection, apprehension, or punishment) death-penalty specification. Hence, he argues that because the state did not prove the (A)(3) death-penalty specification, the three-judge panel considered an invalid aggravating circumstance, a flaw that renders his death sentence invalid.

{¶ 92} Under Crim.R. 11(B)(1), "[t]he plea of guilty is a complete admission of the defendant's guilt." Accord *State v. Wilson* (1979), 58 Ohio St.2d 52, 12 O.O.3d 51, 388 N.E.2d 745, paragraph one of the syllabus ("a counseled plea of guilty is an admission of factual guilt which removes issues of factual guilt from the case * * *").

{¶ 93} Nonetheless, when the offense charged is a capital offense, R.C. 2945.06 and Crim.R. 11(C)(3) require the state to prove guilt of an aggravated-murder charge with death specifications even when an accused pleads guilty. See *State v. Green* (1998), 81 Ohio St.3d 100, 689 N.E.2d 556, syllabus. Hence, in Ohio, "[c]hallenges to the sufficiency of the evidence are therefore expressly permitted on aggravated murder charges" even when the accused pleads guilty. *Carpenter v. Mohr* (C.A.6, 1998), 163 F.3d 938, 946, reversed on other grounds, *Edwards v. Carpenter* (2000), 529 U.S. 446, 120 S.Ct. 1587, 146 L.Ed.2d 518. Accord *State v. Taylor* (1972), 30 Ohio App.2d 252, 258–259, 59 O.O.2d 398, 285 N.E.2d 89 (sufficiency challenges permitted in guilty-plea aggravated-murder cases); *State v. Wright* (Apr. 30, 2001), Allen App. No. 1–2000–71, 2001 WL 454670, *2, following *Taylor.*

{¶ 94} We hold that the evidence was sufficient to establish Ketterer's guilt of the R.C. 2929.04(A)(3) specification. In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259–260, 574 N.E.2d 492, paragraph two of the syllabus. We will not disturb a verdict on appeal on sufficiency grounds unless "reasonable minds

could not reach the conclusion reached by the trier-of-fact." *State v. Dennis* (1997), 79 Ohio St.3d 421, 430, 683 N.E.2d 1096.

{¶ 95} In this case, the trial court had ample evidence from which to find that Ketterer had struck Sanders, thereby committing a felonious assault, and that Ketterer then had decided to kill Sanders so that Sanders did not live to identify Ketterer as his assailant. In his pretrial confession, Ketterer recalled, "I remember then when I hit him with the skillet I was thinking if I just knocked him out, he would know who did it, so I thought I should stab him. And I don't think he moved anymore after I stabbed him."

{¶ 96} Moreover, Ketterer admitted that he had assaulted Sanders because he felt that Sanders "was being very disrespectful" to him. Then Ketterer repeatedly used considerable force to ensure that Sanders did not live to identify him. Dr. Swinehart, the pathologist, noted that Sanders had a "cranial cerebral injury of significant nature" with numerous lacerations and contusions, skull fractures at the top and base of the skull, and extensive brain hemorrhages under the skull fractures. Sanders also suffered from "nine distinct stab wounds," and in addition, "two forks, a knife, and a pair of scissors" were stuck in his face. Sanders also had multiple rib fractures.

{¶ 97} Further, Ketterer's assault on Sanders was not a single act. In fact, the multiple blows with the skillet, nine distinct stab wounds to the chest, four distinct objects stuck in Sanders's face, and multiple rib fractures establish that Ketterer systematically and repeatedly assaulted Sanders.

{¶ 98} In view of Ketterer's admission that he killed Sanders in order to silence him as a witness, as well as the evidence of Sanders's injuries, we hold the evidence sufficient to prove the R.C. 2929.04(A)(3) violation. In other cases, we have found similar evidence sufficient to prove an R.C. 2929.04(A)(3) violation. See, e.g., *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 94 (jury could infer defendant killed victim "to eliminate the only witness against him"); *State v. Smith* (1997), 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (defendants decided to kill the robbery victims because they "didn't want [the victims] to tell on them"); *State v. Cooey* (1989), 46 Ohio St.3d 20, 24, 544 N.E.2d 895 (victim discovered name of accomplice during crime and was killed for that reason).

{¶ 99} Because the evidence proved the R.C. 2929.04(A)(3) death-penalty specification, we reject Ketterer's claim that the death penalty rests upon an invalid aggravating circumstance. We further hold that the (A)(3) specification represented a separate and distinct aggravating circumstance from the (A)(7) specifications alleging murder during a burglary and robbery. See *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 81.

*Ineffective Assistance in General (IV)*

{¶ 100} In proposition IV, Ketterer claims that his attorneys provided ineffective assistance in maintaining the attorney-client relationship and in failing to secure the suppression of evidence, obtain DNA testing, object to death specifications, and assist effectively in presenting mitigation evidence. We will discuss these ineffective-assistance claims separately.

{¶ 101} *Essential attorney-client relationship.* Ketterer claims that his attorneys were ineffective "for failing to establish the essential attorney-client relationship" because his lawyers failed to earn his trust or keep in close contact. However, the "Sixth Amendment does not guarantee 'rapport' or a 'meaningful relationship' between client and counsel." *State v. Henness* (1997), 79 Ohio St.3d 53, 65, 679 N.E.2d 686, quoting *Morris v. Slappy* (1983), 461 U.S. 1, 13–14, 103 S.Ct. 1610, 75 L.Ed.2d 610. Instead, "[t]here is only a right to professionally competent, effective representation." *State v. McNeill* (1998), 83 Ohio St.3d 438, 452, 700 N.E.2d 596. In this case, the record does not establish deficient representation or prejudice.

{¶ 102} Ketterer, a difficult client, fixated on pleading not guilty by reason of insanity ("NGRI") and complained that his lawyers did not spend time with him or follow his advice on how to proceed. According to Dr. Bobbie Hopes, Ketterer "tended to jump to incorrect conclusions and to make poor decisions, due to impaired judgment and reasoning ability." Ketterer also solicited legal advice from fellow prisoners, conduct that caused problems. According to Dr. Hopes, Ketterer also misinterpreted efforts by his lawyers to represent him.

{¶ 103} We find, however, no credible evidence that counsel spent insufficient time with their client, failed to expend appropriate effort to communicate with or advise their client, or provided deficient representation. In fact, at several points during Ketterer's jury waiver and guilty plea, Ketterer asserted that he had talked with his lawyers at length and was satisfied with his attorneys and with their efforts to assist him. Further, Ketterer has not demonstrated that "a reasonable probability [exists] that, were it not for counsel's errors, the result of the trial would have been different." *Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. We reject Ketterer's claims that the trial court should have replaced his counsel, as we discuss later in connection with proposition VII.

{¶ 104} *Ineffective assistance relating to suppression motion.* We also reject Ketterer's contention that his trial counsel provided ineffective representation when counsel argued that Ketterer's pretrial statements to police should have been suppressed.

{¶ 105} First, Ketterer's guilty plea waived any complaint as to claims of constitutional violations not related to the entry of the guilty plea. See *Fitz-*

*patrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 78; *State v. Spates* (1992), 64 Ohio St.3d 269, 595 N.E.2d 351, paragraph two of the syllabus (guilty plea waives defendant's right to challenge deprivation of counsel at preliminary hearing stage); *State v. Kelley* (1991), 57 Ohio St.3d 127, 566 N.E.2d 658, paragraph two of the syllabus (a plea of guilty "effectively waives all appealable errors" at trial unrelated to the entry of the plea).

{¶ 106} Second, Ketterer has failed to show deficient performance from the lack of testimony from a substance-abuse expert at the suppression hearing. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674. Further, Ketterer's claim that he was prejudiced by the lack of such testimony is entirely speculative. Ketterer has no proffer in the record to support that claim. See *Clark v. Mitchell* (C.A.6, 2005), 425 F.3d 270, 283 (neither deficient performance nor prejudice established although counsel did not secure services of neuropsychologist or pharmacology expert at pretrial suppression hearing).

{¶ 107} Third, even if counsel had used different tactics in pursuing the suppression motion, such as objecting to hearsay or pointing out that Ketterer had lied in his pretrial statements, no evidence exists that a different result would have occurred. Thus, Ketterer has not established prejudice, which *Strickland* requires.

{¶ 108} *DNA testing.* Counsel's decision not to more vigorously pursue DNA testing of hairs allegedly found in the victim's hands also reflected a reasoned tactical judgment and reasonable professional judgment. Ketterer confessed to the crime and pleaded guilty. Moreover, Ketterer cannot establish prejudice on this claim, as counsel concedes, because the record does not reflect the DNA results. Cf. *State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 98–99; *State v. Hartman* (2001), 93 Ohio St.3d 274, 298–299, 754 N.E.2d 1150.

{¶ 109} *Objections to specifications.* Ketterer claims that his counsel were ineffective for failing to object to the death-penalty specifications. Here, Ketterer recasts meritless arguments that we have rejected elsewhere. As we discuss in connection with proposition VI, murder during a robbery and murder during a burglary are not duplicative death specifications. Further, the evidence proved Ketterer's guilt of the R.C. 2929.04(A)(3) death-penalty specification, as we discussed in connection with proposition III. Thus, Ketterer has shown neither deficient performance nor prejudice pursuant to *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 110} *Ineffective assistance in mitigation.* Ketterer claims that his counsel provided ineffective representation in the mitigation phase by failing to present testimony from a substance-abuse expert, by allowing their client to admit he

deserved the death penalty, by failing to argue the contributory roles of others in Sanders's death, and by not objecting to prosecutorial misconduct. However, we reject Ketterer's claims because Ketterer establishes neither deficient performance nor prejudice.

{¶ 111} First, we find no evidence in the record as to what a substance-abuse expert would have said in the penalty phase. Thus, Ketterer has not demonstrated prejudice from missing such testimony. Further, Ketterer had available two psychologists who were competent to testify about Ketterer's extensive drug-abuse problems and did so.

{¶ 112} Second, Ketterer claims that counsel were ineffective because Ketterer, in reading his written unsworn statement, said, "I know I should be put to death." But the record does not show that counsel coached or agreed to what Ketterer said. Moreover, Ketterer's personal and genuine remorse, as well as his honest recognition of the severity of his own crimes, may reflect an astute tactical move by counsel before a three-judge panel. "Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another." *Strickland,* 466 U.S. at 693, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 113} Third, Ketterer claims that counsel should have presented evidence and argument concerning "Butler County's and Donald Williams's contributory roles in events leading to the victim's death." According to evidence at the suppression hearing, Donald Williams was a drug dealer, the owner of premises where Gabbard stayed, and an alleged police informant. Nonetheless, defense counsel's decision not to attempt to blame others for crimes that Ketterer confessed to committing alone clearly fell "within the wide range of reasonable professional assistance." Id. at 689, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Moreover, we find no basis to believe that such an approach would have produced different results.

{¶ 114} Fourth, we reject Ketterer's claim that counsel failed to make appropriate objections. As we discuss in connection with propositions VII and IX, these claims have no merit.

{¶ 115} Finally, we reject Ketterer's claim that the "cumulative effect of defense counsel's errors establishes ineffective assistance." Ketterer's counsel provided competent advice and representation. Moreover, compelling evidence of guilt left counsel no reasonable opportunity to contest guilt, other than by a motion to suppress, which counsel filed and vigorously pursued. As to mitigation, we find no particular deficiencies in counsel's performance. In sum, counsel did the best they could with what they had. Cf. *State v. Ballew* (1996), 76 Ohio St.3d 244, 256, 667 N.E.2d 369. Ketterer has not established either deficient performance or prejudice, both of which *Strickland* requires in order to demon-

strate ineffective assistance of counsel. For the foregoing reasons, we overrule proposition IV.

## Suppression Issues (V, XII)

{¶ 116} In proposition V, Ketterer argues that the trial court erred "by denying defense counsel's pretrial motion to suppress Ketterer's involuntary and coerced statements to the police." In proposition XII, Ketterer argues that the police failed to honor Ketterer's rights by not clarifying his comment about counsel before continuing to question him.

{¶ 117} At the outset, we reject propositions V and XII because Ketterer's guilty plea waived his right to contest these issues on appeal. "[A] defendant who * * * voluntarily, knowingly, and intelligently enters a guilty plea with the assistance of counsel 'may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.' " *Fitzpatrick,* 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 78, quoting *Tollett v. Henderson* (1973), 411 U.S. 258, 267, 93 S.Ct. 1602, 36 L.Ed.2d 235. In *Fitzpatrick,* we applied this principle to preclude challenges to rulings on various pretrial motions. 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 79. Accord *Spates,* 64 Ohio St.3d 269, 595 N.E.2d 351, paragraph two of the syllabus (guilty plea waives defendant's right to challenge deprivation of counsel at preliminary-hearing stage); *Kelley,* 57 Ohio St.3d 127, 566 N.E.2d 658, paragraph two of the syllabus (a plea of guilty "effectively waives all appealable errors" at trial unrelated to the entry of the plea).

## Duplicative Counts and Circumstances (VI)

{¶ 118} In proposition VI, Ketterer argues that aggravated robbery (Count Two) and aggravated burglary (Count Three), as well as the death specifications charging aggravated murder in the course of aggravated robbery (specification two) and aggravated burglary (specification three) are duplicative counts and specifications. Thus, Ketterer argues that these offenses and specifications reflect an indivisible course of conduct and are allied offenses of similar import pursuant to R.C. 2941.25(A) (multiple counts); See, e.g., *State v. Mitchell* (1983), 6 Ohio St.3d 416, 417–418, 6 OBR 463, 453 N.E.2d 593.

{¶ 119} However, we have consistently held that "[a]ggravated burglary and aggravated robbery are separate offenses and constitute separate aggravating circumstances because they do not arise from the same act." *State v. Williams* (1996), 74 Ohio St.3d 569, 580, 660 N.E.2d 724. See, also, *State v. Fears* (1999), 86 Ohio St.3d 329, 344, 715 N.E.2d 136; *State v. Reynolds* (1998), 80 Ohio St.3d 670, 681, 687 N.E.2d 1358; *State v. Murphy* (1992), 65 Ohio St.3d 554, 577–578, 605 N.E.2d 884; *State v. Barnes* (1986), 25 Ohio St.3d 203, 207, 25 OBR 266, 495

N.E.2d 922; *State v. Frazier* (1979), 58 Ohio St.2d 253, 256, 12 O.O.3d 263, 389 N.E.2d 1118.

{¶ 120} As we recently held in *State v. Monroe,* 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 68, "[t]he aggravated-burglary and aggravated-robbery specifications were also not subject to merger, since they were committed with separate animus. The burglary was complete as soon as [the defendant] entered the apartment by deception with the intent to commit a theft offense. [The defendant] then attempted to rob [the victims]. * * * Thus, the aggravated burglary and aggravated robbery were separate offenses and constituted separate aggravating circumstances because they did not arise from the same act." Accordingly, we reject proposition VI.

### Miscellaneous Trial Issues (VII)

{¶ 121} In proposition VII, Ketterer cites various constitutional provisions and raises eight separate challenges to his conviction and death sentence. However, we reject each of these challenges.

{¶ 122} *Separate penalty-phase jury.* Ketterer first argues that the trial court denied his constitutional right to have a jury determine the penalty to be imposed. See, e.g., *Ring v. Arizona* (2002), 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556, interpreting *Apprendi v. New Jersey* (2000), 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435, which reiterates a defendant's right to have a jury find the facts relevant to sentencing.

{¶ 123} However, we reject Ketterer's argument because Ketterer knowingly, intelligently, and voluntarily waived his right to a jury trial. Later, he knowingly, intelligently, and voluntarily pleaded guilty as charged. On both occasions, Ketterer acknowledged that he was waiving any right to have a jury decide what penalty to impose for the aggravated murder. Having freely relinquished his right, he cannot now argue that the trial court denied that right. "When a defendant pleads guilty he or she, of course, forgoes not only a fair trial, but also other accompanying constitutional guarantees." *Ruiz,* 536 U.S. at 628, 122 S.Ct. 2450, 153 L.Ed.2d 586, citing *Boykin v. Alabama* (1969), 395 U.S. 238, 243, 89 S.Ct. 1709, 23 L.Ed.2d 274. Accord *United States v. Bradley* (C.A.6, 2005), 400 F.3d 459, 463 (a plea agreement "most pertinently [waives] the right to a trial by jury").

{¶ 124} Further, the applicable statute, R.C. 2945.06, as well as Crim.R. 11(C)(3), contains no provisions permitting an accused charged with aggravated murder to waive a jury, request that three judges determine guilt upon a plea of guilty, and then have a jury decide the penalty. Instead, R.C. 2945.06 directs, "If the accused pleads guilty of aggravated murder, a *court composed of three judges*

shall examine the witnesses * * * [and determine guilt] *and pronounce sentence accordingly.*" (Emphasis added.)

{¶ 125} Moreover, in *State ex rel. Mason v. Griffin,* 104 Ohio St.3d 279, 2004-Ohio-6384, 819 N.E.2d 644, we issued a writ of prohibition against a trial judge who had created "a hybrid procedure—a jury sentencing hearing to make certain findings upon which [the trial judge] would base his sentencing decision." Id. at ¶ 17. We held that by creating a nonstatutory procedure to convene a jury, the trial court "proceeded in a manner in which he patently and unambiguously lacked jurisdiction to act." Id. For the foregoing reasons, we reject Ketterer's complaint about the failure of the trial court to convene a sentencing jury.

{¶ 126} *Evidence at plea hearing.* Ketterer asserts that in view of his guilty plea, the trial court erred to his prejudice in admitting the following at the plea hearing: (a) evidence that a knife, two forks, and a scissors had been stuck in Sanders's face, (b) blood and DNA evidence, and (c) evidence of other acts committed by Ketterer reflected in his pretrial confession.

{¶ 127} However, as we noted earlier, when a defendant pleads guilty to aggravated murder in a capital case, a three-judge panel must receive evidence in order to make a Crim.R. 11 determination as to the guilt of the defendant. *Green,* 81 Ohio St.3d 100, 689 N.E.2d 556, syllabus. Moreover, "[t]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus.

{¶ 128} Here the trial court did not abuse its discretion in admitting, over objection, evidence that a knife, two forks, and a scissors had been stuck in Sanders's face. Evidence of the victim's wounds was relevant to establish Ketterer's intent to kill, an essential element of the offense. Also, the state was required to prove the facts and circumstances of the offenses, including the victim's injuries. Further, the trial panel was required to examine the nature and circumstances of the aggravated murder to determine whether any mitigating facts exist. See *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 354, 662 N.E.2d 311 ("the court is required to review this factor"); R.C 2929.04(B).

{¶ 129} Nor did the trial court abuse its discretion in admitting evidence of blood and DNA analysis that linked Ketterer to the killing of Sanders. The state was required to establish Ketterer's identity as the killer, and the blood and DNA evidence helped to prove that fact. Evid. R. 401.

{¶ 130} Ketterer also complains that the state, over objection, introduced improper evidence of other acts that Ketterer briefly mentioned in his second pretrial confession to police. But the statement in question contained Ketterer's admission that he had killed Sanders. Moreover, the trial court specifically noted, "We will admit the exhibit and we will not consider anything that is

irrelevant to the proceedings and consider it as [redacted]." Thus, no prejudice occurred. A three-judge panel "is presumed to consider only relevant, competent and admissible evidence in its deliberations." *State v. Davis* (1992), 63 Ohio St.3d 44, 48, 584 N.E.2d 1192; *State v. Post* (1987), 32 Ohio St.3d 380, 384, 513 N.E.2d 754.

{¶ 131} Finally, Ketterer cannot realistically argue that this evidence prejudiced his plea hearing, for he pleaded guilty. See *Wilson*, 58 Ohio St.2d 52, 12 O.O.3d 51, 388 N.E.2d 745, paragraph one of the syllabus ("counseled plea of guilty is an admission of factual guilt which removes issues of factual guilt from the case").

{¶ 132} *Evidence at penalty hearing.* Ketterer also asserts that the trial court erred in permitting the state to reintroduce at the penalty phase all of the trial-phase evidence. Ketterer claims this evidence was inadmissible because it did not relate to the charged aggravating circumstances. However, counsel did not object and thereby waived all but plain error. *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus; Crim.R. 52(B).

{¶ 133} No error, plain or otherwise, occurred. A capital penalty-phase hearing is not limited to evidence that pertains only to the aggravating circumstances. See *State v. Wogenstahl*, 75 Ohio St.3d at 352–354, 662 N.E.2d 311; *State v. Gumm* (1995), 73 Ohio St.3d 413, 653 N.E.2d 253, syllabus. Further, "[a] trial court may properly allow repetition of much or all that occurred in the guilt phase pursuant to R.C. 2929.03(D)(1)." *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 73. Accord *State v. DePew* (1988), 38 Ohio St.3d 275, 282–283, 528 N.E.2d 542 (Revised Code "appears to permit repetition of much or all that occurred during the guilt stage").

{¶ 134} Finally, Ketterer has not established prejudice. A panel of judges is presumed to "consider only relevant, competent and admissible evidence in its deliberations." *Davis*, 63 Ohio St.3d at 48, 584 N.E.2d 1192; *Post*, 32 Ohio St.3d at 384, 513 N.E.2d 754. Accordingly, we reject Ketterer's complaints.

{¶ 135} *Gruesome photos.* Ketterer argues the trial court erred by admitting gruesome photographs that prejudiced both the trial and penalty phases. Ketterer's arguments lack merit.

{¶ 136} *Guilt phase.* In view of Ketterer's guilty plea, the admission of gruesome crime-scene or autopsy photographs could not have affected the guilty verdict. Also, Ketterer's guilty plea waived all appealable errors at trial unrelated to the entry of the plea. *Kelley*, 57 Ohio St.3d 127, 566 N.E.2d 658, paragraph two of syllabus; Crim.R. 11(B)(1).

{¶ 137} *Penalty phase.* Ketterer did not object to the reintroduction of the crime scene or autopsy photographs at the penalty phase, and thus waived all but plain error. *Williams,* 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus; Crim.R. 52(B).

{¶ 138} Here, the trial court did not create plain error by readmitting the photographs in the penalty phase. The crime-scene photographs as well as the photographs taken of Sanders's body on a gurney are not repetitive or cumulative and portrayed the nature and circumstances of the crime. Cf. *State v. Issa* (2001), 93 Ohio St.3d 49, 64–65, 752 N.E.2d 904; *State v. Tibbetts* (2001), 92 Ohio St.3d 146, 155–157, 749 N.E.2d 226; *State v. Biros* (1997), 78 Ohio St.3d 426, 443–446, 678 N.E.2d 891. Finally, the panel is presumed to "consider only relevant, competent and admissible evidence in its deliberations." *Davis,* 63 Ohio St.3d at 48, 584 N.E.2d 1192. Accord *State v. Fitzpatrick,* 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 66.

{¶ 139} *Hearing on counsel.* In proposition VII, Ketterer further argues that the "trial court erred by failing to hold a hearing when Ketterer announced in court that he wanted to 'fire' his lead counsel." Ketterer relies upon *State v. Deal* (1969), 17 Ohio St.2d 17, 46 O.O.2d 154, 244 N.E.2d 742, syllabus, wherein this court held that when "an indigent accused questions the effectiveness and adequacy of assigned counsel, * * * it is the duty of the trial judge to inquire into the complaint and make such inquiry a part of the record." See, also, *State v. King* (1995), 104 Ohio App.3d 434, 437, 662 N.E.2d 389 ("inquiry may be brief and minimal, but it must be made"); *State v. Prater* (1990), 71 Ohio App.3d 78, 83, 593 N.E.2d 44 (on particular facts, "the trial court breached its duty to inquire").

{¶ 140} However, the record of the December 9, 2003 hearing, when this issue arose, shows that the trial court knew about the conflict between client and counsel over the NGRI plea, and further inquiry was unnecessary.

{¶ 141} At the December 9, 2003 hearing, Ketterer complained that his attorney, J. Gregory Howard, had disregarded Ketterer's desire to enter an NGRI plea. Ketterer then stated, "I wish, for the record, to change my plea today to what I originally wanted it to be, not guilty by reason of insanity." Ketterer also claimed that his lawyers had not spent enough time with him and that his bond had not been reduced.

{¶ 142} The trial court advised Ketterer that he had the best attorney in the county for the case and that clients do not always like their attorneys because they tell them what the clients do not want to hear. Ketterer responded by discussing the medication he had taken at the time of the crime and by saying that he had known the victim, Sanders, since he was nine years old and did not remember killing him. At that point, the trial court advised Ketterer not to talk further about his case, but to discuss these issues with his attorney.

{¶ 143} Defense counsel then advised the court that counsel had reviewed medical records from VA facilities throughout the country where Ketterer has been treated. Counsel assured the court, "Based upon our investigation in the case as well as other things, it [NGRI] is not a viable option at this point in time. * * * I'm not going to file it just to be filing it if I don't have a reason to back it up." Ketterer then declared to Howard, "You're fired." But the context reflects that the court and counsel did not question Ketterer further at the time because of concern about Ketterer's tendency to discuss the facts of his crimes on the record.

{¶ 144} At a further hearing on January 5, 2004, the trial court, respecting Ketterer's pro se request, ordered a competency evaluation and a report on an NGRI plea. The court also rejected Ketterer's request that his counsel, Howard, be fired. By then, Ketterer had changed his mind and told the court: "I would like to personally apologize to Mr. Howard for saying what I said last week or whatever that was, about firing him." Ketterer was satisfied because his NGRI plea was being explored.

{¶ 145} At the plea hearings, Ketterer stated that he was satisfied with his attorneys and that he had had numerous discussions with counsel. Then Ketterer acknowledged that certain pro se filings in the court of appeals were a mistake.

{¶ 146} Finally, because the differences between Ketterer and his counsel involved whether to enter an insanity plea, no basis existed to find a conflict between counsel and client. The trial court had approved the appointment of Dr. Jeffrey Smalldon, a psychologist, to assist Ketterer's defense. Thus, counsel's tactical decision not to pursue an NGRI defense was an informed decision, and no such plea was pursued at trial. "Decisions about 'the viability of certain defenses' are 'within the exclusive province of defense counsel to make after consultation with his client.'" *State v. Murphy* (2001), 91 Ohio St.3d 516, 524, 747 N.E.2d 765, quoting *Lewis v. Alexander* (C.A.6, 1993), 11 F.3d 1349, 1354.

{¶ 147} In view of Ketterer's withdrawal of his request to fire Howard, we hold that no prejudicial error resulted from the trial court's decision not to further inquire into the relationship between Ketterer and his counsel in December 2003.

{¶ 148} *Failure to provide new counsel.* Ketterer also argues that the "trial court erred when it denied Ketterer's request to remove appointed lead defense counsel and replace him with new counsel." However, we reject Ketterer's complaint for the following reasons.

{¶ 149} In *State v. Coleman* (1988), 37 Ohio St.3d 286, 525 N.E.2d 792, paragraph four of the syllabus, we held: "To discharge a court-appointed attorney, the defendant must show a breakdown in the attorney-client relationship of such magnitude as to jeopardize the defendant's right to effective assistance of counsel." Accord *State v. Henness*, 79 Ohio St.3d at 65, 679 N.E.2d

686. Moreover, " '[a]n indigent defendant has no right to have a particular attorney represent him and therefore must demonstrate 'good cause' to warrant substitution of counsel.' " *Cowans,* 87 Ohio St.3d at 72, 717 N.E.2d 298, quoting *United States v. Iles* (C.A.6, 1990), 906 F.2d 1122, 1130.

{¶ 150} Further, we review the trial court's decision as to replacement of counsel " 'under an abuse-of-discretion standard.' " *Murphy,* 91 Ohio St.3d at 523, 747 N.E.2d 765, quoting *Cowans,* 87 Ohio St.3d at 73, 717 N.E.2d 298. If the complaint is unreasonable, the trial court may "require the trial to proceed with assigned counsel participating." *Deal,* 17 Ohio St.2d 17, 46 O.O.2d 154, 244 N.E.2d 742, syllabus. Accord *Murphy,* 91 Ohio St.3d at 523, 747 N.E.2d 765. "Disagreement[s] between the attorney and client over trial tactics or approach also do not warrant a substitution of counsel." *State v. Evans,* 153 Ohio App.3d 226, 2003-Ohio-3475, 792 N.E.2d 757, ¶ 32.

{¶ 151} In this case, Ketterer's primary complaint, that his counsel failed to pursue an NGRI plea, was unreasonable because Ketterer offers no evidence that an NGRI plea was credible. Moreover, the testimony of Dr. Hopes and Dr. Smalldon during the mitigation phase, as well as Dr. Hopes's competency report, does not reveal any basis for an NGRI plea. As we held in *Cowans,* " ' "A lawyer has a duty to give the accused an honest appraisal of his case. * * * Counsel has a duty to be candid; he has no duty to be optimistic when the facts do not warrant optimism." ' *Brown v. United States* (C.A.D.C.1959), 264 F.2d 363, 369 (en banc), quoted in *McKee v. Harris* (C.A.2, 1981), 649 F.2d 927, 932. ' "If the rule were otherwise, appointed counsel could be replaced for doing little more than giving their clients honest advice." ' " *Cowans,* 87 Ohio St.3d at 73, 717 N.E.2d 298, quoting *McKee,* 649 F.2d at 932, quoting *McKee v. Harris* (S.D.N.Y. 1980), 485 F.Supp. 866, 869.

{¶ 152} Ketterer also argues that a total breakdown in communication existed between himself and counsel. To make this claim, Ketterer cites his letters of December 4, 2003, December 26, 2003, and January 13, 2004. However, we find no support in the record for this claim. While the letters reflect Ketterer's obsession with an NGRI plea, they do not reflect a total breakdown in communications.

{¶ 153} By January 5, 2004, Ketterer had changed his mind about Howard. At the January 5 hearing, Ketterer apologized for attempting to fire counsel and offered no further complaints. Ketterer later stated that he had talked at length with his attorneys and was satisfied with their efforts.

{¶ 154} Therefore, we hold that any lack of communication between counsel and Ketterer was temporary, and no complete breakdown in communications occurred. See *Cowans,* 87 Ohio St.3d at 73, 717 N.E.2d 298 (trial court did not abuse its discretion in rejecting substitution of counsel when any breakdown in

communications was temporary); *State v. Ahmed,* 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 35 ("the record reflects many instances where appellant continued to confer with counsel throughout the proceedings, thus belying his claim that there was a total breakdown in the attorney-client relationship"). For the foregoing reasons, we reject Ketterer's claim of error for failing to replace counsel.

{¶ 155} *Release of grand-jury transcripts.* In proposition VII, Ketterer also argues that the trial court erred when it refused to disclose a grand-jury transcript relating to a criminal case against a prosecution witness, Donald Williams, whom the grand jury declined to indict after Williams assisted law enforcement in this case. Defense counsel wanted the transcript in an effort to impeach Williams.

{¶ 156} However, Ketterer pleaded guilty as charged and thereby waived any basis to complain about the pretrial refusal to release a grand-jury transcript. See *Spates,* 64 Ohio St.3d 269, 595 N.E.2d 351, paragraphs one and two of the syllabus.

{¶ 157} *Record of proceedings.* In proposition VII, Ketterer refers to seven unrecorded side-bar conversations and argues prejudicial error because the "trial court failed to keep a complete record of all proceedings."

{¶ 158} Crim.R. 22 specifies that for serious offenses, "all proceedings shall be recorded." Moreover, R.C. 2929.03(G)(1) and (2) and 2929.05 mandate a complete record in capital cases. *State ex rel. Spirko v. Judges of the Court of Appeals, Third Appellate Dist.* (1986), 27 Ohio St.3d 13, 18, 27 OBR 432, 501 N.E.2d 625. However, we have recognized that this foregoing requirement "does not mean that the trial record must be perfect for purposes of appellate review." *State v. Palmer* (1997), 80 Ohio St.3d 543, 687 N.E.2d 685, syllabus. Accord *State v. Spirko* (1991), 59 Ohio St.3d 1, 15–16, 570 N.E.2d 229.

{¶ 159} In this case, the record is adequate for appellate review. Five of the conferences occurred during the pretrial suppression hearing, and Ketterer's guilty plea waived any issue about that suppression hearing. The sixth occurred during juror excusals. Ketterer's jury waiver and guilty plea waived any issue as to that conference. See *Fitzpatrick,* 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 79, fn. 1. The last conference that Ketterer cites appears from context to concern a five-minute recess.

{¶ 160} In any event, counsel never requested that the unrecorded bench conferences be recorded. Nor has Ketterer attempted to reconstruct these conferences or to establish their importance or that material prejudice resulted. *Palmer,* 80 Ohio St.3d at 554, 687 N.E.2d 685. We have repeatedly refused to reverse convictions or sentences on the basis of unrecorded conferences when a defendant has not taken these steps. Id. Accord *State v. Leonard,* 104 Ohio

St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 182–184; *State v. Nields* (2001), 93 Ohio St.3d 6, 27, 752 N.E.2d 859; *State v. Goodwin* (1999), 84 Ohio St.3d 331, 340, 703 N.E.2d 1251.

## *Proportionality Evidence (VIII)*

{¶ 161} In proposition VIII, Ketterer claims that his right to a fair sentencing hearing was compromised when the trial court excluded relevant sentencing evidence, namely testimony on proportionality in capital sentencing. A witness from the State Public Defender's Office would have testified that in only nine percent of capital indictments was a death sentence actually imposed.

{¶ 162} Under the Eighth Amendment, an accused is entitled to individualized sentencing in determining whether the death penalty is imposed. See *Lockett v. Ohio* (1978), 438 U.S. 586, 601 98 S.Ct. 2954, 57 L.Ed.2d 973; *Woodson v. North Carolina* (1976), 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944. "In Eighth Amendment jurisprudence, mitigating factors are facts about the defendant's character, background, or record, or the circumstances of the offense, that may call for a penalty less than death." *State v. White* (1999), 85 Ohio St.3d 433, 448, 709 N.E.2d 140, citing *Franklin v. Lynaugh* (1988), 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155. Moreover, R.C. 2929.04(C) grants great latitude to the defendant in the presentation of mitigating evidence during penalty-phase proceedings. See, e.g., *State v. Landrum* (1990), 53 Ohio St.3d 107, 115, 559 N.E.2d 710 (hearsay statement of accomplice wrongfully excluded).

{¶ 163} Nonetheless, we hold that the trial court did not err, because "[t]he proportionality review mandated by R.C. 2929.05 is reserved for appellate courts." *State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, ¶ 68, which upheld the trial court's refusal to allow comparison evidence relating to other capital offenses. See, also, *State v. Roe* (1989), 41 Ohio St.3d 18, 25, 535 N.E.2d 1351 (evidence of disposition of other capital cases in county not relevant to sentencing decision); *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus; *State v. Glenn* (1986), 28 Ohio St.3d 451, 458, 28 OBR 501, 504 N.E.2d 701 (newspaper articles debating the death penalty not relevant); *State v. Jenkins* (1984), 15 Ohio St.3d 164, 189–190, 15 OBR 311, 473 N.E.2d 264 (testimony of defense witnesses on capital-punishment statistics was "clearly irrelevant"). Therefore, we reject proposition VIII.

## *Prosecutorial Misconduct (IX)*

{¶ 164} In proposition IX, Ketterer contends that the prosecutor's misconduct in making improper arguments relative to mitigation proceedings violated his constitutional rights. Whether a prosecutor's remarks constitute misconduct depends upon (1) whether the remarks were improper and, (2) if so, whether the remarks prejudicially affected an accused's substantial rights. *State v. Smith*

(1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. Accord *State v. Lott* (1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293. The touchstone of this analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78.

{¶ 165} *Nature and circumstances of the offense.* Ketterer first argues that the prosecutor improperly argued the nature and circumstances of the offense as an uncharged aggravating circumstance. Admittedly, "[i]t is improper for prosecutors in the penalty phase of a capital trial to make any comment before a jury that the nature and circumstances of the offense are 'aggravating circumstances.'" *State v. Wogenstahl,* 75 Ohio St.3d 344, 662 N.E.2d 311, paragraph two of the syllabus.

{¶ 166} Nonetheless, "it is perfectly acceptable for the state to present arguments concerning the nature and circumstances of the offense." Id. at 355, 662 N.E.2d 311. Moreover, *Wogenstahl* noted, "R.C. 2929.04(B) specifically provides that the * * * three-judge panel '*shall consider, and weigh against the aggravating circumstances* proved beyond a reasonable doubt, *the nature and circumstances of the offense* * * * .' (Emphasis added.)" Id. See, also, *State v. Stumpf* (1987), 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph one of the syllabus.

{¶ 167} Viewed in the light of these controlling principles, the prosecutor committed no misconduct by referring to "the nature and the circumstances of this aggravated robbery, and this aggravated murder"; or "the nature and circumstances of a robbery[,] burglary and a murder." See *Wogenstahl,* 75 Ohio St.3d at 356, 662 N.E.2d 311. Moreover, Ketterer did not object to the prosecutor's references to the physical details of the crime during the penalty phase, and no plain error occurred. Crim.R. 52(A) and (B).

{¶ 168} Further, the context of the prosecutor's remarks demonstrates that the prosecutor was not trying to argue that the facts were an aggravating circumstance, but was attempting to challenge Ketterer's claimed mental status as a R.C. 2929.04(B)(3) mitigating factor. "A prosecutor can respond to issues raised by an accused." *State v. Cassano,* 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 101.

{¶ 169} Finally, the three-judge panel is presumed to have " 'considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary.'" *Post,* 32 Ohio St.3d at 384, 513 N.E.2d 754, quoting *State v. White* (1968), 15 Ohio St.2d 146, 151, 44 O.O.2d 132, 239 N.E.2d 65.

{¶ 170} *Misstatement as to record.* Ketterer also argues that the prosecutor misstated the record when he asserted: "There is no evidence before this panel that this violent act or acts were produced by mental illness. No evidence that the cause of the aggravated robbery, the cause of the aggravated burglary and

the fact that this gentleman * * * was killed in his own home to escape apprehension, detection, trial or punishment was a direct result of any mental illness."

{¶ 171} Ketterer claims that the prosecutor misstated the evidence because Dr. Jeffrey Smalldon tied Ketterer's criminal acts directly to his mental status. However, Ketterer failed to object to the prosecutor's comment and thereby waived all but plain error. *Williams,* 51 Ohio St.2d at 117, 5 O.O.3d 98, 364 N.E.2d 1364. We find no plain error.

{¶ 172} Both Dr. Hopes and Dr. Smalldon testified during the mitigation hearing that Ketterer suffered from bipolar disorder. Dr. Smalldon called it "one of the most severe kinds of mental illness." Further, according to Dr. Smalldon, Ketterer "because of his bipolar disorder lacked substantial capacity at the time * * * this offense was committed to conform his conduct to the requirements of the law." But neither Dr. Smalldon nor Dr. Hopes testified specifically that the crimes were "a direct result of any mental illness" or that mental illness caused Ketterer to commit the crimes.

{¶ 173} The prosecutor was entitled to argue the state's interpretation of the evidence. "Prosecutors are entitled to latitude as to what the evidence has shown and what inferences can reasonably be drawn from the evidence." *Smith,* 80 Ohio St.3d at 111, 684 N.E.2d 668. Accord *State v. Richey* (1992), 64 Ohio St.3d 353, 362, 595 N.E.2d 915.

{¶ 174} *Inflaming the passions of the court.* Also in proposition IX, Ketterer argues that the prosecutor sought to "inflame the passions of the trial panel." As an example, Ketterer refers to the prosecutor's comment that "some of the [crime-scene] photographs are gory and some of the photographs are gruesome but so, too, were the acts of the defendant in this case."

{¶ 175} We reject Ketterer's claim of prejudicial error. Ketterer "received a fair trial before trained jurists" notwithstanding claims of prosecutorial misconduct. *Lott,* 51 Ohio St.3d at 167, 555 N.E.2d 293. The three-judge panel is presumed to have " 'considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary.' " *Post,* 32 Ohio St.3d at 384, 513 N.E.2d 754, quoting *White,* 15 Ohio St.2d at 151, 44 O.O.2d 132, 239 N.E.2d 65. For the foregoing reasons, we reject proposition IX.

### Execution of the Mentally Ill (XIII)

{¶ 176} In proposition XIII, Ketterer argues that the execution of a severely mentally ill person is cruel and unusual punishment and is thus constitutionally prohibited. However, we reject proposition XIII on the basis of our decision in *State v. Hancock,* 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 154–158.

*Cumulative Error (XV)*

{¶ 177} In proposition XV, Ketterer makes a generalized claim that the cumulative effect of errors in his trial necessitates reversal of his conviction and death sentence. However, Ketterer received a fair trial and a fair sentencing determination, and no errors occurred that prejudiced his substantial rights. Moreover, "[s]uch errors cannot become prejudicial by sheer weight of numbers." *State v. Hill* (1996), 75 Ohio St.3d 195, 212, 661 N.E.2d 1068; see, also, *State v. Hooks* (2001), 92 Ohio St.3d 83, 85, 748 N.E.2d 528.

*Settled Issues (X, XIV)*

{¶ 178} *Proportionality.* We summarily reject Ketterer's proposition X, which challenges Ohio's system of proportionality review. See *State v. LaMar,* 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 23; *State v. Steffen,* 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus; *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.

{¶ 179} *Constitutionality.* We also summarily reject Ketterer's proposition XIV, which challenges the constitutionality of Ohio's death-penalty statute. *State v. Carter* (2000), 89 Ohio St.3d 593, 606–608, 734 N.E.2d 345; *State v. Clemons* (1998), 82 Ohio St.3d 438, 454, 696 N.E.2d 1009; *State v. Poindexter,* 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus. Finally, we reject Ketterer's international-law challenge. See *State v. Bey* (1999), 85 Ohio St.3d 487, 502, 709 N.E.2d 484; *State v. Phillips* (1995), 74 Ohio St.3d 72, 103–104, 656 N.E.2d 643.

*Sentence Appropriateness (XI)*

{¶ 180} In proposition XI, Ketterer argues that the aggravating circumstances do not outweigh significant mitigating evidence, particularly his mental problems. We will consider this claim during our independent sentence evaluation.

## INDEPENDENT SENTENCE EVALUATION

*Penalty–Phase Evidence*

{¶ 181} At the penalty phase, the defense presented a variety of witnesses and documentary evidence to establish various mitigating factors.

{¶ 182} Dr. Bobbie Hopes, a clinical psychologist, evaluated and tested Ketterer to determine his competency to stand trial and to evaluate a possible plea of not guilty by reason of insanity. Dr. Hopes also described Ketterer's history and background. Ketterer, born in May 1949 in Hamilton, Ohio, was raised by his parents, along with three brothers. As a youth, Ketterer developed rheumatic fever and was frequently hospitalized during his first 12 years. His father, who physically abused him, died when Ketterer was 13 years old. Ketterer did poorly in school and quit in the 11th grade.

{¶ 183} Ketterer entered the Army in 1968 and was honorably discharged in 1971. In 1973, he was sentenced to prison for three years for an armed robbery involving a toy pistol. For over 20 years, Ketterer lived and worked as an itinerant house painter in various parts of the country. In 1996, while he was living in California, a van struck Ketterer, and he has since suffered from serious neck and back pain despite hospitalization and therapy.

{¶ 184} According to Dr. Hopes, Ketterer's extensive psychological history extends back to 1979, with treatment and hospitalizations in Veterans Administration facilities throughout the country, including California, Arizona, Oklahoma, Tennessee, and Ohio. His treatment has included at least three in-house drug-treatment programs. Over the years, physicians and psychologists have diagnosed Ketterer as suffering from alcohol dependency, polysubstance dependency (amphetamines, cocaine, opiates, and other substances), chronic depression, major depressive disorders, and bipolar disorder. Ketterer also has a personality disorder with antisocial and borderline traits and an extensive history of suicide attempts and gestures.

{¶ 185} In Dr. Hopes's view, Ketterer does have a "severe mental disease or defect. He suffers from bipolar disorder, and he has symptoms of both manic and depressive disorders * * * [and] features of personality disorders." His mental disease or defect has "psychotic features" in that he has auditory hallucinations and is paranoid. According to Dr. Hopes, a genetic component exists as to Ketterer's mental status in that Ketterer's family is "filled with people with depression, bipolar disorder, and suicides."

{¶ 186} Mary Johnson, a drug addict, had known Ketterer for 27 years, and he befriended her many times, tried to get her to stop using drugs, and provided food and shelter for her when she was living on the street and committing prostitution. Johnson testified that she loves and wants to marry Ketterer, who "was very good to [her], nice, gentle, kind."

{¶ 187} Jacklyn Lutes, another drug addict, testified that she has been Ketterer's friend for 21 years and that she is like a sister to him. At various times, when Lutes was living on the street, Ketterer provided housing and food and discouraged her from using drugs. In 1997 and 1998, they both attended Alcoholics Anonymous meetings, but when she started using drugs again, she would lose contact with Ketterer. At times, Ketterer was sober and did not use drugs, but he often relapsed. Lutes described Ketterer as a nice guy, whom she loves like a brother.

{¶ 188} Norman Lewis, the county jail warden, testified that Ketterer was never a problem inmate, and Lewis never received any complaints against Ketterer.

{¶ 189} Thomas Ketterer, the defendant's younger brother, testified that he is on a variety of medications and has a depression/anxiety disorder. The defendant has two other brothers, George and Michael, both of whom also have mental problems. George was in Lima State Hospital for the criminally insane for a few years. When the Ketterer brothers were being raised, their father regularly beat his three older sons with a razor strap, sometimes for no reason. Thomas loves his brother Donald, and he does not want him to receive the death penalty.

{¶ 190} Dr. Jeffrey Smalldon, a board-certified forensic psychologist, evaluated Ketterer and administered a battery of psychological tests. Dr. Smalldon also reviewed other relevant records, including records of 13 different psychiatric hospitalizations of Ketterer between 1995 and 2002. Common themes of diagnosis at different facilities show a prominent mood disorder, namely depression or bipolar disorder, a long-standing history of alcoholism, a chronic history of polysubstance dependence, and a personality disorder with borderline and anti-social features.

{¶ 191} Ketterer began drinking when he was 14 years old and drank more heavily after joining the Army when he was 19 years old. He also began to use methamphetamines. For 30 years, Ketterer has been a chronic alcoholic, and he has used different drugs, including marijuana, amphetamines, cocaine, and barbiturates. During his life, he has tried at times to remain drug- and alcohol-free and has periodically succeeded, once for four and one-half years.

{¶ 192} Dr. Smalldon tested Ketterer's IQ at 72, or borderline, while Dr. Hopes tested Ketterer's IQ at 84. Dr. Smalldon noted, however, that Dr. Hopes did not conduct one particular subtest on which Ketterer performed very poorly, and a low–70s IQ would be more accurate. School records reflected Ketterer's IQ as 80 when he was 11 years old, and a later test at age 15 showed a verbal IQ of 74 with a vocabulary IQ of 62.

{¶ 193} In Dr. Smalldon's view, Ketterer has a severe bipolar disorder, "one of the most severe kinds of mental illness." At times, Ketterer's disease manifests in major depression, at "other times manifesting in a manic episode or highly elevated energy and extreme problems [in] self-regulation and impulse control." Dr. Smalldon concluded that Ketterer "because of his bipolar disorder lacked substantial capacity at * * * the time this offense was committed to conform his conduct to the requirements of the law." Smalldon agreed, however, that a viable defense of not guilty by reason of insanity did not exist and that Ketterer was competent to be tried.

{¶ 194} In an unsworn statement, Ketterer lamented, "I stand before you as a shamed and saddened man having to deal with all the bad terrible things that I have done because of my mental illness and alcohol and drug abuse." According to Ketterer, Sanders treated him as a "real father." He said, "[Sanders] never

beat me, always had patience for me and treated me like a son and took me fishing and played ball with me and listened to my problems like a father should be." Because of Sanders, Ketterer "was clean and sober for 40 some months."

{¶ 195} Ketterer expressed strong regrets to the trial panel: "I'm so sorry, so sorry[,] * * * please forgive me." He added, "[A]ll I can ask is that the Lord please forgive me, that the Court try to show some kind of mercy." He asked forgiveness from the family and friends of Sanders and prayed that at least one judge would vote for life imprisonment.

{¶ 196} The defense also offered several exhibits into evidence, including Ketterer's school records, a military-discharge form reflecting his Army service from October 1968 until his honorable discharge in June 1971, and extensive medical-treatment records from psychiatric facilities. These exhibits provide detail on Ketterer's background and psychiatric history and support testimony from Dr. Hopes and Dr. Smalldon.

*Sentence Evaluation*

{¶ 197} After independent assessment, we hold that the evidence proves the aggravating circumstances—i.e., that Ketterer killed Sanders in the course of an aggravated burglary, R.C. 2929.04(A)(7), during an aggravated robbery, R.C. 2929.04(A)(7), and to escape detection or apprehension, R.C. 2929.04(A)(3).

{¶ 198} As to mitigation, we hold that the nature and circumstances of the offense offer no mitigating features. In the course of an aggravated burglary and aggravated robbery, Ketterer murdered his 85–year–old friend, Sanders, by beating and stabbing him to death. Then Ketterer looted Sanders's home and stole his car.

{¶ 199} In contrast, Ketterer's history and background do provide modest mitigating features, although his character offers nothing mitigating. When Ketterer and his three brothers were being raised, their father beat them with a razor strap, and all of the brothers suffered from various mental problems. Ketterer's father died when he was 13 years old. When Ketterer was 14 years old, he began drinking and later dropped out of high school. We accord some mitigating weight to evidence of his deprived childhood and dysfunctional family upbringing.

{¶ 200} As to Ketterer's background, we also accord mitigating weight to his service in the United States Army from 1968 until 1971 and his honorable discharge. See *State v. Hessler* (2000), 90 Ohio St.3d 108, 130, 734 N.E.2d 1237. We accord only minimal mitigating weight to his sporadic history of employment as an itinerant painter from 1976 until his arrest. Cf. *State v. Fox* (1994), 69 Ohio St.3d 183, 194, 631 N.E.2d 124. As to "other factors," R.C. 2929.04(B)(7), we accord minimal mitigating weight to his friendship with and assistance to two

women in distress who think highly of him. We also recognize as mitigating that Ketterer has not been a disciplinary problem while incarcerated and that he expressed remorse in his unsworn statement. Cf. *State v. Rojas* (1992), 64 Ohio St.3d 131, 143, 592 N.E.2d 1376. Further, we regard Ketterer's assistance to police, and particularly his guilty plea, as a significant mitigating factor. See *Ashworth*, 85 Ohio St.3d at 72, 706 N.E.2d 1231.

{¶ 201} In evaluating this case, we note that Ketterer has been a chronic alcoholic and drug abuser for over 30 years. At times, he maintained sobriety and then relapsed. Considering his ability at times to remain sober and drug-free, we accord only minimal weight for his status as an alcoholic and chronic drug user.

{¶ 202} We regard evidence of Ketterer's severe mental problems as a significant mitigating factor under R.C. 2929.04(B)(3). Both Dr. Smalldon and Dr. Hopes diagnosed Ketterer as suffering from a bipolar disorder, which was described as "one of the most severe kinds of mental illness." From 1995 to late 2002, Ketterer was hospitalized for his psychiatric problems on 13 occasions in Tennessee, Texas, Oklahoma, Ohio, Arizona, and California, and his psychiatric records corroborate their diagnosis. In addition to alcoholism, polysubstance dependence, and the bipolar disorder, Ketterer has a personality disorder with prominent borderline and antisocial features. Further, Ketterer has a limited IQ, which has been tested between 72 and 84, and we accord that factor weight in mitigation. Cf. *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, ¶ 115–119.

{¶ 203} In Dr. Smalldon's view, Ketterer "because of his bipolar disorder lacked substantial capacity at the time * * * this offense was committed to conform his conduct to the requirements of the law." Although Dr. Hopes did not specifically confirm this finding, her testimony was consistent with finding this R.C. 2929.04(B)(3) factor. No evidence contradicted this finding. Thus, we regard the R.C. 2929.04(B)(3) factor as proved by a preponderance of the evidence.

{¶ 204} As to other statutory mitigating factors, Sanders did not induce or facilitate the offense, R.C. 2929.04(B)(1), nor did Ketterer act under "duress, coercion, or strong provocation," R.C. 2929.04(B)(2). Ketterer cannot claim tender years, R.C. 2929.04(B)(4), or lack of a criminal record, R.C. 2929.04(B)(5), or accomplice status, R.C. 2929.04(B)(6). Under R.C. 2929.04(B)(7), we consider as mitigating factors Ketterer's remorse, his assistance to others, his adaptability to a structured environment, his assistance to police, and his guilty plea to the offenses charged against him.

{¶ 205} After weighing the aggravating circumstances against the mitigating evidence, we conclude that the aggravating circumstances outweigh the collective

mitigating factors. In the course of an aggravated robbery and aggravated burglary, Ketterer savagely beat and stabbed his friend, an 85-year-old man. Although Ketterer suffers from a major mental illness, his condition is "one of the most treatable of the major mental illnesses."

{¶ 206} Further, Ketterer has received extensive medical treatment, the benefit of many hospitalizations, and many opportunities to take control of his life. He has repeatedly failed to do so.

{¶ 207} Further, we hold that the death penalty is proportionate when compared with other aggravated murders committed during the course of an aggravated burglary and an aggravated robbery. See, e.g., *State v. Noling,* 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 151; *State v. Jones* (2000), 90 Ohio St.3d 403, 423, 739 N.E.2d 300; *State v. Stallings* (2000), 89 Ohio St.3d 280, 301, 731 N.E.2d 159; *State v. Spivey* (1998), 81 Ohio St.3d 405, 424, 429, 692 N.E.2d 151; *State v. Berry* (1995), 72 Ohio St.3d 354, 366–367, 650 N.E.2d 433; *State v. Slagle* (1992), 65 Ohio St.3d 597, 614, 605 N.E.2d 916; *State v. Murphy,* 65 Ohio St.3d 554, 586, 605 N.E.2d 884; *State v. Lott,* 51 Ohio St.3d 160, 177, 555 N.E.2d 293; and *State v. Barnes,* 25 Ohio St.3d 203, 213, 25 OBR 266, 495 N.E.2d 922.

{¶ 208} We also conclude that the death penalty is proportionate when compared with cases involving killings to escape detection. See, e.g., *State v. Sheppard* (1998), 84 Ohio St.3d 230, 232, 241, 703 N.E.2d 286; *State v. Burke* (1995), 73 Ohio St.3d 399, 407, 653 N.E.2d 242.

{¶ 209} Accordingly, we affirm the judgment of the common pleas court.

Judgment affirmed.

RESNICK, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

PFEIFER and LUNDBERG STRATTON, JJ., concur separately.

---

**LUNDBERG STRATTON, J., concurring.**

{¶ 210} Ketterer is not a sympathetic defendant. He brutally murdered a family friend because he felt that his friend had been disrespectful to him when Ketterer asked to borrow some money. After the ruthless murder, Ketterer stole whatever he could find and traded the ill-gotten goods for cocaine.

{¶ 211} However, there are other facts also vital to understanding this apparently senseless murder. Ketterer is a person with a serious mental illness. His family also has a long history of mental illness and suicide attempts. Ketterer himself was hospitalized repeatedly and attempted suicide several times. His mental illness was fueled by drug and alcohol abuse. Two psychologists testified that Ketterer had a serious mental illness, known as bipolar disorder, which makes it difficult for him to control impulses normally. Not even the state

disputed that he was seriously mentally ill. But the state argued that Ketterer could have controlled his behavior. The three-judge panel accepted the state's position. Ketterer has now been sentenced to death.

{¶ 212} Ketterer did not meet the standard for being found not guilty by reason of insanity. Under our current law, the evidence supported a finding of guilt. However, we can never truly know whether Ketterer would have committed this senseless crime against a long-time friend had he not been seriously mentally ill. The undisputed testimony regarding Ketterer's serious mental illness places him in a very different category from persons without a mental illness. One expert clearly testified that Ketterer was *not* able to control his impulses. The facts of the crime seem to show that Ketterer had the ability to plan and act. But how can we truly judge the effect of this terrible illness?

{¶ 213} I believe that the time has come to reexamine whether we, as a society, should administer the death penalty to a person with a serious mental illness.

{¶ 214} Although the majority opinion deals mostly with guilt-phase issues, the court does acknowledge that Ketterer suffers from an undisputedly serious mental illness. However, a deeper exploration of the facts yields greater insight on this issue.

{¶ 215} The defense presented solid, unrefuted evidence at trial that Ketterer had been afflicted by lifelong mental illness. Dr. Bobbie Hopes, a clinical psychologist testifying for the defense, completed a forensic evaluation of Ketterer's competency. At trial, she testified, "As a child, [Ketterer] was severely physically abused by his father. His two older brothers and his mother were also physically abused. His father died when Ketterer was 13 years old, and despite years of physical abuse, Ketterer found this death very traumatic. And he started hearing voices, his father's voice, within about a year after his father died, so around age 15 he started hearing his father's voice. Primarily what he would hear would be his father threatening to beat him or telling him to assume the position for a beating."

{¶ 216} In preparing for her evaluation, Dr. Hopes reviewed psychiatric records from at least 13 different cities and hospitals where Ketterer had been admitted. He had had at least one hospitalization in each of these facilities and some private hospitalizations. According to Dr. Hopes, Ketterer's history of mental illness dates to 1979, with treatment and hospitalizations in Veterans Administration ("VA") hospitals in at least five states. In addition, his treatment included at least three in-house drug-treatment programs.

{¶ 217} Dr. Hopes testified that Ketterer has had different diagnoses throughout his life. For many years, the primary diagnosis was major depressive disorder. More recently, from about 1997 on, the more common diagnosis has

been bipolar disorder. In addition, various reports refer to personality-disorder, antisocial, and borderline-personality traits.

{¶ 218} Dr. Hopes testified that Ketterer also has a long history of chemical abuse. His voluminous hospital records refer to a long history of drug and alcohol dependency and "multi-drug abuse," including abuse of marijuana, amphetamines, cocaine, and narcotics. Narcotics abuse followed his 1996 spinal injury.

{¶ 219} According to Dr. Hopes, in the months preceding the crimes, Ketterer had deteriorated so much that he attempted suicide after his landlord would not fix the windows immediately. He drank half a bottle of whiskey and took his entire month's supply of Klonopin, an antianxiety drug, and Elavil, an antidepressant. In the opinion of Dr. Hopes, Ketterer was so embarrassed by his relapse that he did not tell his psychiatrist at the VA hospital about his relapse, so he went for a month without his medicine, deteriorated further, began another drinking binge, started using cocaine, and was again mixing Klonopin with alcohol.

{¶ 220} In Dr. Hopes's opinion, Ketterer suffers from bipolar disorder, a severe mental disease or defect, with symptoms of both manic and depressive disorders and features of personality disorders. Dr. Hopes opined that Ketterer's mental illness includes psychotic features, including auditory hallucinations and paranoia.

{¶ 221} Dr. Hopes testified that when she interviewed Ketterer, he was experiencing five symptoms of depression: crying, lack of appetite, insomnia, fatigue, and diminished ability to concentrate. He was distracted by his own thoughts and could not concentrate on any one topic. Dr. Hopes testified that it normally takes her two hours to do a competency evaluation, but in Ketterer's case, it took her three hours, and she obtained less information from him than she obtains in two hours during the usual evaluation.

{¶ 222} Dr. Hopes noted that the primary characteristics of mania are poor impulse control and impaired judgment. "People with this disorder tend to do things that are inappropriate, unethical and illegal, and things that they wouldn't normally do if they weren't in a manic phase." Moreover, Ketterer's use of alcohol and illicit drugs seriously intensified his mental illness and accelerated his poor judgment and lack of impulse control.

{¶ 223} Dr. Hopes also noted that Ketterer fell into the category of about 20 to 30 percent of people with bipolar disorder who have residual symptoms that never go away. Dr. Hopes testified that there is a genetic component to mental illness and that many of Ketterer's family members suffer from depression and bipolar disorder. Ketterer's brother was diagnosed with and treated for major depressive disorder for many years, and more recently, he has been treated for

bipolar disorder. Another brother was hospitalized at a state mental hospital, and a cousin was treated for depression. A cousin and an uncle both committed suicide.

{¶ 224} Dr. Jeffrey Smalldon, a respected board-certified forensic psychologist, also interviewed Donald Ketterer and testified for the defense. In addition to his clinical evaluation, Dr. Smalldon administered IQ tests. Ketterer's verbal IQ estimate was 76, his performance IQ estimate was 73, and his full-scale IQ estimate was 72. According to Dr. Smalldon, 72 falls within "the borderline range of IQ. And what that means is that typically IQs 70 and below are associated with diagnosis of mental retardation. * * * So [Ketterer] falls toward the bottom of that borderline range that comes between mild and mental retardation and low average." Although Dr. Hopes estimated a verbal IQ of 84, Dr. Smalldon noted that Dr. Hopes failed to administer the "vocabulary subtest, which was one of the verbal subtests on which Ketterer obtained his lowest score. Had she administered that subtest, that would have significantly lowered his verbal IQ estimate from 84 to somewhere within the 70s."

{¶ 225} Dr. Smalldon counted 13 different psychiatric hospitalizations between 1995 and 2002. Dr. Smalldon testified that Ketterer suffers from a major mental illness: "Certainly in my diagnostic impression, the most severe, the most significant mental illness is bipolar disorder mixed meaning at various times manifesting periods of major depression and other times manifesting in a manic episode or highly elevated, energy and extreme problems in self-regulation and impulse control. Certainly the bipolar mixed with at least fluctuating psychotic symptoms over time is the most significant mental health problem that I have diagnosed him as having."

{¶ 226} As for Ketterer's substance-abuse problems, Dr. Smalldon testified that Ketterer's mother told Ketterer that his alcoholic father had put alcohol in his baby bottle to make him sleep. Ketterer began drinking by choice at around age 14, shortly after his father's death. He continued to drink throughout his adolescence. When he entered the Army at age 19, he began drinking more heavily and using speed more heavily. For over 30 years, he was chronically alcohol dependent and abused a wide variety of substances, such as marijuana, speed, barbiturates, and cocaine.

{¶ 227} Dr. Smalldon testified that because of Ketterer's bipolar disorder, Ketterer "lacked substantial capacity at the time or around the time this offense was committed to conform his conduct to the requirements of the law."

{¶ 228} The defense testimony regarding Ketterer's severe mental illness was unrefuted. Even the majority acknowledges that no evidence contradicted these findings, and it gave his mental illness weight in mitigation. See R.C. 2929.04(B)(3). However, the majority relied on Dr. Smalldon's description of

bipolar disorder as "one of the most treatable of the major mental illnesses," despite Dr. Hopes's conclusion that Ketterer was in the category of persons with bipolar disorder whose recurrent symptoms never go away.

{¶ 229} The issue here is not Ketterer's guilt. The three-judge panel had sufficient evidence for its finding. In light of the evidence presented, the panel could choose to discount the expert's testimony regarding Ketterer's lack of substantial capacity to conform his conduct to the law, even though no professional refuted that testimony. And under our current law, the court's sentence of death is also supported. It is, however, the current law, I believe, that we as a society should reexamine.

{¶ 230} Our law requires "a system of capital punishment at once consistent and principled but also humane and sensible to the uniqueness of the individual." *Eddings v. Oklahoma* (1982), 455 U.S. 104, 110, 102 S.Ct. 869, 71 L.Ed.2d 1. In *Atkins v. Virginia* (2002), 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335, the United States Supreme Court concluded that executing mentally retarded offenders constituted cruel and unusual punishment forbidden by the Eighth Amendment to the United States Constitution. The court determined that "evolving standards of decency" dictated that conclusion. Id., quoting *Ford v. Wainwright* (1986), 477 U.S. 399, 405, 106 S.Ct. 2595, 91 L.Ed.2d 335.

{¶ 231} *Atkins* identified " 'retribution and deterrence of capital crimes by prospective offenders' " as the social purposes served by the death penalty. Id. at 319, 122 S.Ct. 2242, 153 L.Ed.2d 335, quoting *Gregg v. Georgia* (1976), 428 U.S. 153, 183, 96 S.Ct. 2909, 49 L.Ed.2d 859. *Atkins* noted that there was a serious question as to whether either justification applied to mentally retarded offenders. Id. at 321, 122 S.Ct. 2242, 153 L.Ed.2d 335. I too question whether either justification applies to severely mentally ill offenders.

{¶ 232} Deterrence is of little value as a rationale for executing offenders with severe mental illness when they have diminished impulse control and planning abilities. As for retribution, capital punishment still enjoys wide public support among Americans, but a Gallup Poll conducted in October 2003 found that while almost two thirds of Americans surveyed support the death penalty, 75 percent of those surveyed in 2002 opposed executing the mentally ill. Kevin Drew, Arkansas Prepares to Execute Mentally Ill Inmate, CNN.com, Jan. 5, 2004, at http://www.cnn.com/2004/LAW/01/05/singleton.death.row/index.html.

{¶ 233} Society's discomfort with executing the severely mentally ill among us is further evidenced by the American Bar Association's formation of a task force in 2003 to consider mental disability and the death penalty. After studying the issue, the task force made recommendations that were adopted by the ABA House of Delegates in August 2006:

{¶ 234} "RESOLVED, That the American Bar Association, without taking a position supporting or opposing the death penalty, urges each jurisdiction that imposes capital punishment to implement the following policies and procedures:

{¶ 235} "1. Defendants should not be executed or sentenced to death if, at the time of the offense, they had significant limitations in both their intellectual functioning and adaptive behavior, as expressed in conceptual, social, and practical adaptive skills, resulting from mental retardation, dementia, or a traumatic brain injury.

{¶ 236} "2. Defendants should not be executed or sentenced to death if, at the time of the offense, they had a severe mental disorder or disability that significantly impaired their capacity (a) to appreciate the nature, consequences, or wrongfulness of their conduct; (b) to exercise rational judgment in relation to conduct; or (c) to conform their conduct to the requirements of the law." See ABA Report with Recommendation No. 122A, Adopted August 2006, at http://www.abanet.org/leadership/2006/annual/dailyjournal/hundredtwentytwoa. doc. See, also, Symposium: The Death Penalty and Mental Illness, Recommendations of the American Bar Association Section of Individual Rights & Responsibilities Task Force on Mental Disability and the Death Penalty (2005), 54 Cath.U.L.Rev. 1115.

{¶ 237} The National Alliance on Mental Illness ("NAMI") adopted both of these recommendations as part of its public policy platform. Public Policy Platform of NAMI (7th Ed.Rev.), Sections 9.6.1.1 and 9.6.1.2. The American Psychological Association adopted both recommendations, and the American Psychiatric Association adopted the second recommendation. Tabak, Overview of Task Force Proposal on Mental Disability and the Death Penalty (2005), 54 Cath.U.L.Rev. 1123, 1125–1126, fn. 11 and 12.[1]

{¶ 238} Over the past 30 years, the number of people on death row with mental illness and other disabilities has steadily increased. Although precise statistics are not available, it is estimated that five to ten percent of people on death row have a serious mental illness. National Mental Health Association, Death Penalty & People with Mental Illnesses (2006), http://www.nmha.org/position/ deathPenalty/deathpenalty.cfm.

{¶ 239} Moreover, Ketterer suffers from co-occurring disorders: a serious mental illness and substance-abuse issues. Research has shown that co-occurring disorders are very common. The NAMI website cites reports published in the Journal of the American Medical Association, finding, "Roughly 50 percent of

---

1. This information was obtained prior to the final adoption of ABA Recommendation No. 122A by the ABA House of Delegates in August 2006; presumably, these groups will also now adopt the final recommendations.

individuals with severe mental disorders are affected by substance abuse." http://www.nami.org/Template.cfm?Section=ByIllness&template=/ContentManagement/ContentDisplay.cfmContentID=10333.

{¶ 240} Further, NAMI cites two surveys as the best data available on the prevalence of co-occurring disorders: the Epidemiologic Catchment Area ("ECA") Survey, administered between 1980 and 1984, and the National Comorbidity Survey ("NCS"), administered between 1990 and 1992. Id. "Results of the NCS and the ECA Survey indicate high prevalence rates for co-occurring substance abuse disorders and mental disorders, as well as the increased risk for people with either a substance abuse disorder or mental disorder for developing a co-occurring disorder. For example, the NCS found that:

{¶ 241} "● 42.7 percent of individuals with a 12–month addictive disorder had at least one 12–month mental disorder.

{¶ 242} "● 14.7 percent of individuals with a 12–month mental disorder had at least one 12–month addictive disorder." Id.

{¶ 243} In addition, "[t]he ECA Survey found that individuals with severe mental disorders were at significant risk for developing a substance use disorder during their lifetime. Specifically:

{¶ 244} "● 47 percent of individuals with schizophrenia also had a substance abuse disorder (more than four times as likely as the general population).

{¶ 245} "● *61 percent of individuals with bipolar disorder also had a substance abuse disorder (more than five times as likely as the general population)."* (Emphasis added.) Id.

{¶ 246} Justice John Paul Stevens, writing for the Supreme Court majority in *Atkins,* concluded, "Mentally retarded persons * * * have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan* * *. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability." *Atkins,* 536 U.S. at 318, 122 S.Ct. 2242, 153 L.Ed.2d 335. There seems to be little distinction between executing offenders with mental retardation and offenders with severe mental illness, as they share many of the same characteristics.

{¶ 247} However, mental illness is not as easily quantified as mental retardation. Mental retardation is a fixed condition with more objective symptoms. Mental illness is a much broader category, with wide ranges of diagnoses and periods of decompensation and remission. Treatment options vary widely, includ-

ing counseling, behavior modifications, group therapy, and medication. Some treatments and medications are controversial as to effectiveness and side effects. Mental illness as a defense is a difficult issue to quantify in a court of law.

{¶ 248} However, we have made enormous medical and scientific advances in both diagnosis and treatment that are now supported by solid research. Therefore, while I personally believe that the time has come for our society to add persons with severe mental illness to the category of those excluded from application of the death penalty, I believe that the line should be drawn by the General Assembly, not by a court. Some would argue that *Atkins* was the product of an activist court in basing its decision on "evolving standards of decency." *Trop v. Dulles* (1958), 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630. However, nothing prevents the legislature from examining and using those same evolving standards. In fact, it is the legislature's role to do so. Therefore, I urge our General Assembly to consider legislation setting the criteria for determining when a person with a severe mental illness should be excluded from the penalty of death. Unlike mental retardation, which can be determined by a number on an IQ test and other basic criteria, mental illnesses vary widely in severity. The General Assembly would be the proper body to examine these variations, take public testimony, hear from experts in the field, and fashion criteria for the judicial system to apply.

{¶ 249} " '[L]aws and institutions must go hand in hand with the progress of the human mind. As that becomes more developed, more enlightened, as new discoveries are made, new truths disclosed, and manners and opinions change with the change of circumstances, institutions must advance also, and keep pace with the times.' " *Furman v. Georgia* (1972), 408 U.S. 238, 409, 92 S.Ct. 2726, 33 L.Ed.2d 346, fn. 7, quoting Letter to Samuel Kercheval, July 12, 1816, 15 The Writings of Thomas Jefferson (Memorial Ed.1904) 40–42.

{¶ 250} The time has come for our society to reexamine the execution of persons with severe mental illness. Until the General Assembly does so, under our current law, they will continue to be executed. As I am bound to follow the law as it stands today, I reluctantly concur in the affirmance of Ketterer's sentence of death.

PFEIFER, J., concurs in the foregoing opinion.

---

Robin N. Piper, Butler County Prosecuting Attorney, Daniel G. Eichel, First Assistant Prosecuting Attorney and Chief, Appellate Division, and Michael A. Oster Jr., Assistant Prosecuting Attorney, for appellee.

David H. Bodiker, Ohio Public Defender, and Ruth L. Tkacz and Timothy R. Payne, Assistant Public Defenders, for appellant.