[Cite as *State v. Pember*, 2021-Ohio-2939.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 19AP-880 |
| | | (C.P.C. No. 18CR-5356) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Brandon M. Pember, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on August 26, 2021

**On brief**: [*G. Gary Tyack*], and *Kimberly M. Bond*, for appellee.

**On brief**: *Campbell Law*, *LLC*, and *April F. Campbell*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} This is an appeal by defendant-appellant, Brandon M. Pember, from a judgment of sentence and conviction entered by the Franklin County Court of Common Pleas following a jury trial in which a jury returned a verdict finding him guilty of sexual battery. For the following reasons, we reverse the conviction.

{¶ 2} On October 29, 2018, appellant was indicted on one count of sexual battery, in violation of R.C. 2907.03. Appellant entered a plea of not guilty, and the trial court conducted a jury trial beginning October 28, 2019.

{¶ 3} The first witness to testify for the state, plaintiff-appellee, was Dustin M. Halko. Halko testified he is currently "in recovery" for drug addiction and has been since December 2018. (Tr. Vol. II at 220.) He started "using and selling marijuana * * * at a

really young age, and some other drugs." (Tr. Vol. II at 221.) He is currently on probation for weapons under disability, and has past convictions including possession of drugs, attempted breaking and entering, theft, and domestic violence.

{¶ 4} Halko and appellant were acquainted, having attended high school together. In October 2018, Halko was using drugs. At that time, appellant was staying at Halko's house. Halko was acquainted with the alleged victim, K.W., "through friends." (Tr. Vol. II at 229.)

{¶ 5} Halko related an incident in October 2018 when he and appellant had an altercation at his house. Halko testified that appellant "came in and just told me that [K.W.] was asleep, and when she was asleep he basically had sex with her." (Tr. Vol. II at 230.) Halko became angry and "probably threw the first punch," and they then "started wrestling around." (Tr. Vol. II at 231.) Halko could not remember appellant's "exact words," but Halko testified that appellant "said she was asleep and he had sex with her." (Tr. Vol. II at 232.) Halko testified he understood this to mean "intercourse," or "take your penis and put it in her vagina while she was out cold." (Tr. Vol. II at 232.) Halko testified that appellant and K.W. were not romantically involved.

{¶ 6} As a result of the fight, appellant called police. After police arrived, appellant was taken into custody "[b]ecause he had warrants." (Tr. Vol. II at 234.) Appellant returned to Halko's house several days later to pick up his personal property and was accompanied by sheriffs "to make sure nothing happened." (Tr. Vol. II at 235.)

{¶ 7} On cross-examination, Halko stated K.W. had been at his house "for one day, to my knowledge." (Tr. Vol. II at 240.) Halko denied any romantic involvement with K.W. Halko could not recall the exact date of the incident but testified the incident happened "whenever [appellant] made the phone call the first time." (Tr. Vol. II at 243.)

{¶ 8} On October 20, 2018, Franklin County Sheriff Deputy Ben Damschroder testified that he and another deputy, Deputy David Maynard, were dispatched to the residence "to meet someone that was trying to get their property from inside the house." (Tr. Vol. II at 259.) The deputies met with appellant "who stated he needed to get some items out of the house." (Tr. Vol. II at 260.)

{¶ 9} The deputies went to the door of the residence and "the victim * * * who answered the door * * * was immediately upset that we were there." (Tr. Vol. II at 261.)

The female "allowed us to come in and start gathering his things," and "she became extremely agitated and started yelling at [appellant], alleging things in her comments that made me believe that a crime had occurred." (Tr. Vol. II at 262.) Deputy Damschroder testified that "a couple of different times [she] referred to him as a rapist * * * while he was gathering things." (Tr. Vol. II at 263.) Because she was angry, the deputies separated appellant and K.W. Deputy Maynard "was outside with [appellant]," while Deputy Damschroder "went back to speak with [K.W.] about the statements that she had made." (Tr. Vol. II at 263.)

{¶ 10} Deputy Damschroder "had enough to believe that a crime had been committed," and testified that "[t]he incident * * * she had described * * * had taken place a couple days prior * * * so my next move was to notify the detective bureau for the Franklin County Sheriff's Office and give him the information." (Tr. Vol. II at 264, 265.) Deputy Damschroder spoke with K.W. about medical treatment, but she "did refuse medical treatment at that time." (Tr. Vol. II at 266.) The deputies transported both K.W. and appellant to talk to detectives.

{¶ 11} K.W. testified she has been sober for one year. Prior to that time, she was "shooting meth and sometimes heroin." (Tr. Vol. II at 278.) In October 2018, K.W. was homeless. K.W. was introduced to appellant through a friend and K.W. was invited to stay at the house for a few weeks until her grandparents arrived to take her to Illinois. K.W. stayed in appellant's room but denied any romantic involvement with him. K.W. also denied any romantic involvement with Halko, stating "[w]e were just friends." (Tr. Vol. II at 287.) Appellant told her he "didn't use his room," and that he "didn't sleep in there * * * so I could have my own privacy and my own space and be left alone from everybody." (Tr. Vol. II at 285.)

{¶ 12} K.W. gave the following account of the events at issue. She was "hanging out in the room" by herself, and appellant "kept coming in and arguing with me, because he had actually asked me probably three times that week * * * if I would sleep with him and/or date him and things like that, and I would argue with him, and he would get real erratic and nuts." (Tr. Vol. II at 288.)

{¶ 13} At one point, appellant "went to shoot me up [with meth], and it wouldn't work." (Tr. Vol. II at 288.) K.W. stated her "veins were very bad," and it was "hard for me

to do a shot at all." (Tr. Vol. II at 289.) K.W. and appellant then got into an argument because K.W. "had asked [Halko] to help." (Tr. Vol. II at 290.) K.W. remembers "sitting on the edge of the bed," and appellant "had calmed down, and he was sitting kind of next to me, and that was it." (Tr. Vol. II at 290.)

{¶ 14} K.W. then recalled: "I woke up and I was laying down, and I sat up, and it was like I couldn't breathe." (Tr. Vol. II at 290.) She "started panicking and looking for my stuff, because I * * * didn't know where my stuff was." (Tr. Vol. II at 291.) K.W. always slept with her purse next to her and her phone in her hand. When K.W. went to bed, she "was wearing a shirt and hoodie" because the house had no heat and "it was freezing." (Tr. Vol. II at 291.) K.W. stated she "was covered in the blanket" and "still had [her] hoodie on," but she "didn't realize at first that I didn't have pants on. My legs were numb. I couldn't even move my legs to the side of the bed to sit up." (Tr. Vol. II at 291.) K.W. "had no pants or underwear on," and she "did not know why," and she "couldn't find them." (Tr. Vol. II at 292.)

{¶ 15} Appellant then "came in the room" and K.W. was "trying to talk" but "was panicking." (Tr. Vol. II at 292.) K.W. did not want appellant "to realize that I didn't have pants on because I didn't know why and I didn't know how to explain it, and I was * * * embarrassed and didn't want him to see." (Tr. Vol. II at 292.)

{¶ 16} Appellant "didn't say anything, and he just kneeled down at the end of the bed and he picked up my pants and my underwear that were down on the floor, and he just tossed them on the bed, but, like, away from me." (Tr. Vol. II at 293.) K.W. testified appellant "already knew what I was looking for. He didn't ask me. He didn't say anything. He knew I was looking for them." (Tr. Vol. II at 293.)

{¶ 17} K.W. testified she "grabbed them" and "I don't think I really understood yet, and then he said something, and I don't remember what it was, but I just remember being like, '[w]ait, what?' I don't know." (Tr. Vol. II at 293-94.) K.W. then said, "[w]ait, we didn't have sex." (Tr. Vol. II at 294.) Appellant "smiled like this. He was like, '[w]ell, well, yeah, but you were unconscious, so I stopped.' And those were his exact words to me." (Tr. Vol. II at 294.) K.W. said, "[w]hat the F did you just say to me? And he repeated it exactly like that again." (Tr. Vol. II at 294.) When asked what she meant by "sex," she responded "[a]

guy's thing going in a female." (Tr. Vol. II at 294.) And she clarified "thing" meant "penis" and by "female" she meant "vagina." (Tr. Vol. II at 294-95.)

{¶ 18} K.W. further testified: "When I noticed that I didn't have pants and underwear on, I felt my leg; * * * [a]nd I just wiped my hand like this, and it was just soaked. Like, my hand was just soaking wet, like I was covered in sweat. And then I took my hand down on my vagina and did the same thing, and it was the same thing." (Tr. Vol. II at 295.)

{¶ 19} K.W. denied giving appellant permission to have sex with her. After appellant "repeated it the second time, I stood up and started screaming. I stood up on the bed and got away from him, and he stood on the side of the bed and was standing there arguing with me." (Tr. Vol. II at 296.) K.W. began "yelling for [Halko], and [Halko] came in the room." (Tr. Vol. II at 297.) K.W. told Halko part of what had occurred and then Halko and appellant began fighting.

{¶ 20} K.W. testified that appellant called police after the fight. Appellant was arrested that evening on a warrant for a traffic offense. K.W. stated she was reluctant to tell police what happened because of her drug use. Approximately three days later, appellant returned to the house to collect his property. K.W. told him that his property was on the porch, but police "said that he could go through the house to look for his property." K.W. then "just started freaking out." (Tr. Vol. II at 301.)

{¶ 21} K.W. eventually spoke with detectives. She was not forthcoming with the detectives about her drug use. K.W. could not recall the exact date of the incident but told the detective it was "the day that he got arrested." (Tr. Vol. II at 307.) At trial, K.W. identified appellant.

{¶ 22} On cross-examination, K.W. stated she had stayed at Halko's residence for approximately three to four days prior to the incident. Appellant was the only individual who dialed 911 after the incident. When deputies arrived after the fight, K.W. did not tell them of any alleged sexual conduct by appellant.

{¶ 23} When appellant returned to the house several days later with police officers, K.W. "told the cops what had happened." (Tr. Vol. II at 317.) K.W. testified that, after appellant was arrested and incarcerated, she became romantically involved with Halko and did drugs with Halko. K.W. spoke with detectives about going to the hospital for an

examination, but K.W. did not go because the detective "called [her] a liar." (Tr. Vol. II at 306.)

{¶ 24} At the close of the state's case-in-chief, counsel for appellant made a Crim.R. 29 motion for judgment of acquittal but the trial court denied the motion. Following deliberations, the jury returned a verdict finding appellant guilty of the charge. By judgment entry filed December 3, 2019, the trial court sentenced appellant to 18 months incarceration, and imposed a mandatory period of post-release control of 5 years.

{¶ 25} On appeal, appellant sets forth the following six assignments of error for our review:

> I. The trial court violated Pember's constitutional right to due process by admitting Pember's statement without independent proof of Corpus Delicti for sexual battery.
>
> II. Because of counsel's consistent failure to object to Pember's statements about the alleged incident, Pember was prejudiced, denying Pember's Constitutional right to effective assistance.
>
> III. The State's evidence that Pember committed sexual battery was legally insufficient as a matter of law.
>
> IV. The evidence weighed manifestly against convicting Pember of sexual battery.
>
> V. The State violated Pember's Due Process Right to a fair trial through prosecutorial misconduct, which prejudicially affected him in a manner that requires reversal.
>
> VI. Pember was denied his right to a fair trial in this case because of cumulative error.

{¶ 26} Since we find appellant's third assignment of error is dispositive of this appeal, we address it first. By his third assignment of error, appellant contends the evidence was legally insufficient as a matter of law. Sufficiency is a test of adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), *superseded by statute on other grounds*. "The standard when testing the sufficiency of the evidence ' "is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." ' " *State v. Beverly*, 143 Ohio St.3d 258, 2015-Ohio-219, ¶ 15, quoting *State v. McKnight*, 107 Ohio

St.3d 101, 2005-Ohio-6046, ¶ 70, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1990), paragraph two of the syllabus, *superseded by statute on other grounds*, following *Jackson v. Virginia*, 443 U.S. 307 (1979). A reviewing court "will not disturb a verdict on appeal on sufficiency grounds unless 'reasonable minds could not reach the conclusion reached by the trier-of-fact.' " *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, ¶ 94, quoting *State v. Dennis*, 79 Ohio St.3d 421, 430 (1997).

{¶ 27} Appellant was charged with one count of sexual battery, a violation of R.C. 2907.03(A)(3), which provides, as follows:

> No person shall engage in sexual conduct with another, not the spouse of the offender, when any of the following apply:
>
> * * *
>
> The offender knows that the other person submits because the other person is unaware that the act is being committed.

{¶ 28} "Sexual conduct" is defined in R.C. 2907.01(A) as:

> [V]aginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

{¶ 29} In this case, appellant argues there is insufficient evidence of penetration. Halko testified that, although he could not remember appellant's exact words, appellant told him "K.W. was asleep, and when she was asleep he basically had sex with her." (Tr. Vol. II at 230.) Halko testified that he understood this to mean "intercourse," or "take your penis and put it in her vagina while she was out cold." (Tr. Vol. II at 232.) K.W. testified that she remembers asking Halko to help "shoot me up [with meth]." (Tr. Vol. II at 288; 290.) K.W. remembers sitting on the edge of the bed and appellant was sitting next to her then she recalls waking up while no longer wearing her underwear and pants. When K.W. asked appellant about them having sex, she stated that appellant "smiled like this. He was like, '[w]ell, well, yeah, but you were unconscious, so I stopped.' And those were his exact words to me." (Tr. Vol. II at 294.) When asked what she meant by "sex," she responded,

"[a] guy's thing going in a female." (Tr. Vol. II at 294.) And she clarified "thing" meant "penis" and by "female" she meant "vagina." (Tr. Vol. II at 294-95.)

{¶ 30} However, even though both Halko and K.W. testified they meant intercourse, or a man's penis inside a woman's vagina, neither one testified that appellant penetrated K.W.'s vagina or that appellant told them he had penetrated K.W.'s vagina. K.W. testified that she was "covered in sweat" and her hand and vagina were "soaked," but that also is not evidence of penetration. (Tr. Vol. II at 295.) K.W. did not testify that actual penetration occurred, and testified that appellant's "exact words" included that he "stopped." (Tr. Vol. II at 294.) This statement is too vague to be the basis of penetration.

{¶ 31} Further, there was no physical evidence of penetration. While we recognize that a victim's testimony alone can be sufficient to support a conviction, physical evidence can corroborate testimony. *State v. West*, 10th Dist. No. 06AP-111, 2006-Ohio-6259, ¶ 16.[1]

{¶ 32} Appellant cites *State v. Ferguson*, 5 Ohio St.3d 160 (1983), for support that this case lacks evidence of penetration. Although *Ferguson* involved a conviction for rape, not sexual battery, the Supreme Court of Ohio found there was insufficient evidence of the required penetration for sexual conduct, stating as follows:

> In the instant case, the *only* evidence which arguably tends to establish vaginal or anal intercourse is the testimony of the victim. Her testimony in that regard is limited to the statement, "And then we had intercourse a couple times."
>
> We hold that the state's evidence on the element of sexual conduct was insufficient to establish that appellee had either vaginal or anal intercourse with the victim. The victim's testimony was that she and appellee only had "intercourse." The victim did not testify that she and appellee had sexual intercourse, nor did the victim testify as to *any* degree of penetration.

(Emphasis sic.) *Ferguson* at 167-68.

---

[1] The mere absence of corroborating physical evidence does not negate the testimony of a witness to a crime. *West* at ¶ 18, citing *State v. Owens*, 9th Dist. No. 19932 (Jan. 24, 2001). The prosecution can establish proof of guilt through circumstantial evidence, physical evidence or testimonial evidence; all three classes have equal probative value. *State v. Jordan*, 10th Dist. No. 05AP-1330, 2006-Ohio-5208, ¶ 27, citing *State v. Nicely*, 39 Ohio St.3d 147, 151 (1988).

{¶ 33} In *Ferguson*, the court explicitly stated that "where the victim testifies that she and the accused only had 'intercourse' and does not testify as to any degree of vaginal or anal penetration, convictions on charges relating to either vaginal or anal intercourse are based on insufficient evidence." *Id.* at 168.

{¶ 34} The state attempts to distinguish *Ferguson* on the basis that this case involves appellant's confessions to Halko and K.W, in addition to K.W testifying regarding "the circumstances immediately surrounding the offense." (Appellee's Brief at 29-30.) However, K.W.'s testimony regarding the circumstances surrounding the offense do not provide any evidence as to penetration. Further, the state argues that *Ferguson* was decided before *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, ¶ 19-20, where the Supreme Court concluded that a reviewing court considers all the evidence admitted during trial when determining whether there is sufficient evidence of guilt. This court has considered all the evidence admitted at trial and determined the evidence of penetration is insufficient.

{¶ 35} This case is similar to *State v. Frazier*, 10th Dist. No. 05AP-1323, 2007-Ohio-11, ¶ 27, where this court found the evidence insufficient to support the convictions for rape by digital vaginal penetration, as the victim testified that appellant repeatedly "touched her vagina or 'private parts' with his hand," but the victim "did not testify that appellant inserted his hand or fingers into her vagina." *See also State v. Miller*, 3d Dist. No. 4-93-24 (Jan. 11, 1995), where a sexual battery charge was predicated on vaginal intercourse. The victim testified that the defendant pulled her clothes off and "he raped me." The victim also testified that the defendant gave her a tissue to clean herself after the incident. "Other testimony alludes to a generality of 'having sex' with [the defendant] on numerous occasions as well as a general reference to a rape." The defendant admitted to having sex with the victim many times, but denied sexual conduct took place on the date in question. Given that testimony, the Third District Court of Appeals found the victim's testimony that " 'he raped me' infers that vaginal intercourse transpired and, in turn, infers that the intercourse included penetration." However, the court found that events must be described with sufficient clarity to establish the offender's guilt beyond a reasonable doubt and found the testimony insufficient evidence of sexual conduct. *Id.*, quoting *Ferguson* at 271-72. *See also State v. Paskins*, 5th Dist. No. 40-CA-78 (July 24, 1979) (holding that victim's

testimony that defendant "took his thing out" and "[p]ut it in my bottom" was insufficient as a matter of law to show penetration to support a conviction of rape); *State v. D.H.*, 10th Dist. No. 16AP-501, 2018-Ohio-559, ¶ 55 (evidence demonstrated appellant penetrated the victim's labia but failed to demonstrate appellant inserted his penis into the victim's vagina where victim testified appellant "rubbed his penis up and down '[b]etween the lips of [her] vagina' ").

{¶ 36} Thus, after viewing the evidence in a light most favorable to the prosecution, we find there was insufficient evidence to sustain appellant's conviction for sexual battery because the element of penetration for sexual conduct has not been proven beyond a reasonable doubt. We sustain appellant's third assignment of error and based on our disposition of appellant's third assignment of error, appellant's remaining assignments of error are rendered moot. Accordingly, the judgment of the Franklin County Court of Common Pleas is hereby vacated, and a judgment of acquittal is entered for appellant.

*Judgment vacated;*
*judgment of acquittal entered.*

BROGAN, J., concurs.
LUPER SCHUSTER, J., concurring.

LUPER SCHUSTER, J., concurring.

{¶ 37} I concur because I believe we are bound by the precedent in *State v. Ferguson*, 5 Ohio St.3d 160 (1983).

BROGAN, J., retired, formerly of the Second Appellate District,
Assigned to active duty under authority of the Ohio
Constitution, Article IV, Section 6(C).

_____